In re EAGLE–PICHER INDUSTRIES, INC., et al., Debtors.

Bankruptcy No. 1–91–00100.

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Dec. 4, 1995.

As Amended Dec. 14, 1995.

Robert A. Goering, Cincinnati, OH, for debtors.

**DECISION and ORDER ON 1) DEBTORS' MOTION TO ESTIMATE LIABILITY and 2) ON MOTION OF UCC FOR INFORMATION GATHERING**

BURTON PERLMAN, Bankruptcy Judge.

Eagle–Picher Industries, Inc., and its affiliated Chapter 11 debtors (hereafter "debtors") filed Motion to Estimate Debtors' Liability on Account of Asbestos-related Personal Injury Claims. The Motion states that it is made in accordance with § 502(c) of the Bankruptcy Code. In the Motion, the court

is asked to "decide the liability with respect to present and future asbestos-related personal injury claims in the aggregate for the purposes of determining the appropriate distributions to creditor classes under the Plan or any other plan that may be proposed in these Chapter 11 cases. The Court would not decide liability or assign a permanently fixed value for such claims." All of the parties herein understand that the purposes of estimation of asbestos claims are, first, so that a proper allocation of plan funding assets can be made as between the unsecured creditors and the PI Trust created by the plan, and, second, whether there is any equity available for equity security holders.

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding arising under 28 U.S.C. § 157(2)(B).

The several official constituencies involved in these bankruptcy cases are the consolidated debtors (sometimes hereafter referred to as "Eagle–Picher"); the Injury Claimants' Committee (hereafter "ICC") which represents present asbestos and lead personal injury claimants; the Future Claims Representative (hereafter "FCR") who represents future asbestos and lead claimants; the Unsecured Creditors' Committee (hereafter "UCC") which represents other unsecured claimants; and the Equity Committee (hereafter "EC") which represents stockholders of the prefiling debtors.

In September, 1994, the UCC moved for initiation of information gathering procedures, and on May 30, 1995, renewed that motion. In the course of proceedings in these cases, this court observed that it would be appropriate on the part of the UCC to oppose debtors' motion for estimation on grounds that sampling was necessary so that the sampling issue would be considered in connection with that matter. Consequently, we will, in the course of this decision, deal with the motion of the UCC for initiation of information gathering procedures.

A hearing on estimation was held. Prior to the hearing, debtors, the ICC and the FCR reached an agreement in principal which contemplated the establishment of a trust, pursuant to a confirmed plan of reorganization, into which all asbestos-related personal injury claims would be channeled. Those parties negotiated a value for asbestos claims of $1.5 billion, and that figure appears in the plan which was subsequently filed. In the course of the hearing on estimation, the court asked the various parties, in light of that compromise figure, whether it was necessary, in their view, for the court to fix a figure for estimated asbestos liability, or whether we could accept the compromised figure arrived at by those parties who were proponents of the plan. It is the position of the three parties who are proponents of the plan that the court should determine a value for asbestos claims, and the plan would be modified to use that figure. The UCC appears not to disagree with that view. The EC, however, argues that if the $1.5 billion figure is abandoned, there is no plan before the court as required by § 157(b)(2)(B). We are persuaded that the outcome of this estimation hearing must be an estimated dollar amount of asbestos liability, if the court finds this possible in the light of present knowledge. We hold further that a plan is before the court as contemplated by § 502(c), even though it may subsequently be modified.

Also, preliminarily we deal with a question as to which the parties are in disagreement. That is, the date as of which estimation of asbestos claims is to be made. The UCC argues that this must be as of the date of the date of the filing of the petition. The ICC, while purporting not to disagree with this position, asserts that it is improper to bring future values back to the filing date for the purpose of determining present value. Rather do they contend that future values should be present valued as of the effective date of the plan because only then will the PI Trust be funded. We conclude and hold that the estimated values for asbestos claims which we will be determining herein are to be valued as of the filing date of the petition. This is not a complicated question, for the statute at § 502(b) expressly states that "the court ... shall determine the amount of such claim ... as of the date of the filing of the petition." This includes, in our view, a requirement that future values be present val-

ued as of the filing date of the petition, January 7, 1991. The argument of the ICC that the adjustment of time value of money should be brought back only to the time that the trust is funded is not well taken. That argument assumes that what is at hand in the time valuing process has to do with the specific facts of this case. That is not so. The time valuing process is a theoretic one, quite divorced from any question about when the presently contemplated trust will be funded. The theoretical present valuing process relates back to the filing date of the bankruptcy case. By the same token, payments made in the past which enter into the valuation process must likewise be adjusted to the filing date.

The first step in the present estimation process requires that we state what it is that we are estimating. The Bankruptcy Code at § 502(c) makes it clear that we are estimating claims, and the term "claim" is defined in the Bankruptcy Code at § 101(5)(A) for present purposes as a "right to payment." And turning again to § 502(c)(1), it is "contingent or unliquidated" claims, the value of which we are estimating. This is to be distinguished from estimating the value which claimants might take in satisfaction of their claims through some bankruptcy mechanism such as a trust of the sort provided for at § 524(g), and as contemplated in the present plan.

For purposes of understanding the following discussion, we must define some terms. What is known is that prior to the filing of the bankruptcy case, the debtors disposed of a large number of asbestos claims, some 77,000, by settlement or by trial. These claims will hereafter be referred to as the "closed claims." Next, there is a group of claims which are identified as the "open claims." This refers to claims lodged against the debtor prior to January 7, 1991, the date of the filing of the bankruptcy petition. These claims are unliquidated. Characteristics of each of them, however, are known. Then there are the "future claims," that is, the claims which will be filed after the date the bankruptcy petition was filed. There is a subset of this category of claims to which reference must be made because it plays a part in some of the testimony. At an earlier stage of the case, this court set a bar date of September 30, 1992, by which time proofs of claim by asbestos claimants were to be filed. A number of such proofs of claim were filed. The plan, however, makes no distinction in how unliquidated asbestos claims pre- or postpetition will be compensated in the future. All claims, prepetition open claims, and postpetition claims, will be compensated by the PI Trust in the same manner.

Another usage herein which requires definition is the term "nominal value." This refers to the dollar amount for which a claim was actually settled. It is to be contrasted to the term "real value" which refers to a time adjusted value for a "nominal value."

At the hearing on debtors' estimation motion, each of the constituencies active in this case offered the testimony of an expert in support of its position. Curiously, each of the plan proponents, the debtors, the ICC, and the FCR, offered its own expert whose conclusions varied appreciably. The FCR's expert was Dr. John F. Burke, Jr. That for the debtors was Dr. B. Thomas Florence. For the ICC, Dr. Mark A. Peterson testified. The expert for the UCC was Scott Beiser. Finally, the expert for the EC was Dr. Roman L. Weil. All of the experts were in substantial agreement as to the number of closed cases. The figures they used ranged from 74,166 to 77,989. Further, there was little disagreement about the number of open cases. Florence, Beiser and Peterson stated that these were 65,495, 65,000, 65,252, respectively.

In the discussion which now ensues, we will deal first with estimation of the value of the open claims, and then, separately, with the same for future claims.

1. Estimating Open Prepetition Claims.

Each of the experts, other than Burke, testified with regard to the open prepetition claims, and each of them offered an opinion as to their value. Burke offered no opinion as to a value for open prepetition claims because his assignment was limited to valuing future claims.

In his testimony, Florence said that he recognized six categories of disease: mesothelioma, lung cancer, other cancer, asbestosis, pleural abnormality, and other/unknown. He analyzed the 77,989 closed cases in the Eagle–Picher database, and derived the number of cases for each category in the closed case database, and the settlement amount for each. Florence did not go into extensive detail of his process, but gave by way of example his finding that there were 1,528 mesothelioma cases open pre-bankruptcy. He valued them at $40,988,600 based on his closed case analysis. This is stated in 1990 dollars. (Tr. 131.) In a like manner, he reached a total value for all of his categories of open prepetition claims. In 1990 dollars, he valued the open claims at $353,134,904, and in 1995 dollars at $375,771,276.

In his testimony, Peterson broke down the time periods involved in the case into three. The first is prepetition. The second is 1991 to 1995 (bankruptcy filing until the present date). The third period is future beyond 1995. Here we deal only with the portion of his testimony relating to prepetition claims. He said that there are 65,000 open prepetition claims. Peterson used eight different methods to estimate liability for them. In the first method (Tr. 302), he took the simple average payment that Eagle–Picher had made in order to resolve claims over the period 1980 to 1990, and adjusted that average for inflation. This gave him a value in 1991 (mid-point) dollars of $493,631,380 and in 1996 dollars $567,553,272.

The second method involved deriving an average payment for closed claims of each type, mesothelioma, lung cancer, other cancer, asbestosis, pleural, and asbestos-related. The total by this method was $507,273,553 in 1991 dollars and $583,238,376 in 1996 dollars. The third method showed the average payment for each of the six categories of disease for 25 categories of occupation, which gave him a value of $451,567,251 in 1991 dollars and $519,189,989 in 1996 dollars. This appears to involve substantially the same valuation approach as employed by Florence.

The next method valued on the basis of disease type and state, and resulted in a 1991 valuation of $570,275,631 and in 1996 dollars

of $655,675,091. Peterson's fifth method analyzed the cases by average payment for each of the six disease categories, depending upon law firm. This method yielded a value in 1991 dollars of $535,759,877 and $615,990,562 in 1996 dollars. The sixth method arrived at an average payment for each of six disease categories, depending upon the year in which the claim was filed. This gave a value in 1991 dollars of $450,693,174 and $518,185,018 in 1996 dollars. The seventh calculation determined average payments classified by exposure industry. The total was $423 million in 1991 dollars and $502 million in 1996 dollars.

Peterson then did a multiple regression analysis which utilized and integrated all the variables of the seven methods. This gave him a value in 1991 dollars of $492 million and $565 million in 1996 dollars. Utilizing these seven methods, Peterson said allowed him to value the open claims even if they differ somewhat from the closed claims. Peterson testified that this was the best method for evaluating the open claims. In his valuing process, Peterson averaged settlements from the period 1980 to 1990, adjusting each year for inflation to 1991 dollars. (Tr. 302.)

Beiser used four different what he called "approaches" for his estimation. One of them he called the "discounted cash flow approach." This analysis is the same as the one employed by Burke, Florence, and Peterson. This is the only one of Beiser's approaches in which there is separate discussion of the open prepetition claims. Beiser starts off somewhat differently from Florence and Peterson. He first looks at the 65,000 open pre-petition claims and makes a judgment as to how many were meritless or of lower severity. He concluded that 16,000 of them were of that category. He then "analyzed Eagle–Picher's historical closed claim file" and "by focusing primarily on the year 1990, but also looking at the years 1988 to 1990" (Tr. 596) concluded that the indemnity value should be $6,300. He does not go through the exercise as do the others of the methodology for arriving at the $6,300 figure. We are not informed by him as to whether this figure is adjusted to the filing date, or is based on nominal values. Beiser does not

state a separate value for open prepetition claims in his testimony. We may infer, however, that he would arrive at such a value by multiplying $6,300 by 65,000–16,000 = 49.000. This would give a value of $308,700,-000 for open prepetition claims.

Weil testified on behalf of the EC. He did not separately value the open claims. Instead, he arrived at a total number of all claims filed up to the bar date. Thus, there are 77,546 closed claims, and 72,459 open prepetition claims. He said that of the 72,-459 open prepetition claims, 7,082 did not file proofs of claim, so that he reduces the number of prepetition open claims to 67,402. Postpetition and by the bar date, another 83,834 proofs of claim were filed. This gives a total of 151,236 proofs of claim. Weil said that there are 1,833 duplications, so that net pre-bar date claims total 149,403.

Weil testified that it was unsound to utilize debtors' claims database to value open claims. A summary of his reasons follows. Preliminarily we must note that Weil identifies 22,031 of his 149,403 claimants as having been filed by the Maritime Asbestos Legal Clinic ("MALC"). Weil's first reason for doubting the validity of using debtors' closed claims database for valuing open claims is that (Tr. 790) "I have read and have heard others say that MALC claims are generally thought to be less meritorious, less expensive, less costly, have lower valuations than non-MALC claims." Next, Weil says that executives of debtors testified that they were selective in choosing cases to settle, that is, they chose where liability was clearer than in other cases. This evidently suggested to Weil that cases remaining open were of lesser value than those closed. As a further reason, he demonstrated that geographically there is a significant difference in the mix of claims settled and open, again suggesting non-uniformity in open and closed cases. He points out that average settlement amounts dropped from 1987 to 1990, and he testified that he disagreed with Peterson's inflation adjustments. A major factor in his analysis was that debtors' purchase of asbestos in relation to total U.S. production decreased with time, with a maximum in 1953 and a minimum in 1971. He testified that there-

fore debtors' share of liability should decline commensurately. Another factor he considered had to do with latency about which he said: "I understand latency to mean the period that elapses between a person's first exposure to asbestos and the time a disease or malady is first diagnosed in that person." (Tr. 814.) He had been told that the latency period for mesothelioma averages around 40 years; for lung cancer, 20 to 30 years; for others less than 20 years. Weil, in his testimony, developed a relationship between latency and the decreasing market share of debtors' over time. He reached the conclusion that because of the latency period for mesothelioma, and the decreasing market share of asbestos purchases by debtors, this combination of factors ought to lead to a much smaller liability for mesothelioma and other liabilities in later years than in earlier.

Weil values the 149,403 claims by reference to the UNR Trust. (UNR Industries, Inc. was an asbestos case filed in the Northern District of Illinois. The UNR Trust was the mechanism created by the plan in that case for compensating asbestos claimants.) Weil had sent to the people at UNR the social security numbers of the 149,403 Eagle–Picher claimants, and UNR reported back that 116,491 of them were in their database, 78% of the 149,403. UNR has settled with 89,342 of the 116,491 matched claimants. Of these, 68,112 received payments, while 21,230 received zero. (Tr. 825.) The average settlement cost to the UNR Trust was $1,158. (The $1,158 represents the average settlement figures arrived at by the UNR Trust, and does not represent what cash was actually received by claimants because claimants only got a percentage of their claims pursuant to the plan arrangement. Weil points out that 60,000 UNR claims were settled for $400.)

Weil testified that UNR's database gave him information about disease classification for the 89,000 closed claims so he computed average cost by disease for UNR for mesothelioma, cancer, asbestosis, etc. By thus categorizing, he arrived at a valuation by disease for the UNR of 27,149 open cases. He arrived at an average of $1,973. He then utilized the $1,158 and $1,973 figures to ar-

rive at a weighted average (Tr. 830) of $1,348. He multiplied this times the 149,403 claimants of Eagle–Picher to reach a total of $201 million as his estimate of the value of the Eagle–Picher open claims, plus other claims filed up to the bar date, September 30, 1992.

Recalling that we are in this section dealing with the open prepetition claims, in view of the offerings of the several expert witnesses, the first question to be faced is whether these claims should be separately valued. Florence and Peterson believe they should. While Beiser has paid attention to these claims as a group, he does not offer a separate opinion as to their value. Weil values the open claims only in combination with pre-bar date claims. This court has reached the conclusion that a value should be placed on the open prepetition claims and this should be a separate component of our final estimate. This is so because a great deal of information about these claims is available, so that a reasonably accurate estimate of the value of these claims based on experience is possible.

A second question is raised by the testimony, and that is whether it is sound to value the open prepetition claims based upon the closed prepetition claims of the debtors. Weil questioned the validity of doing so. In our view, the answer to this question is also inescapably in the affirmative. In valuation, the only sound approach is, if possible, to begin with what is known. To begin without utilizing information known about *these* debtors and their history in the handling of claims which have been asserted against them in the past, and their disposition, is to ignore a valuable experiential resource. Debtors have a database containing detailed information about each of the closed claims. From the database it is possible to associate with each claim characteristics such as occupation of the claimant, nature of the disease, the amount which was paid to the claimant, as well as a number of other factors, as particularly identified by Peterson. Because much of the same information is known about the open prepetition claims, though, of course, not the settlement amount, it is possible to ascertain with some degree of accuracy what the settlement figures for those claims would be had they been resolved prepetition. The objections of Weil fail for reasons discussed hereafter at p. 16.

Of the experts who offered a numerical opinion for the value of open prepetition claims, this court has concluded that the opinion of Peterson rests on the soundest basis. In reaching his opinion, Peterson took into consideration a large number of variables in the closed claims and used those in valuing the open claims. We have derived a valuation from the testimony of Peterson for open claims as of the filing date of $478,000,-000. (Peterson testified that his value of open claims as of mid–1991 was $492 million. This value should be adjusted by half a year for a value as of the filing date. As discussed hereafter at p. 31, this court views 6% as the proper discount rate to be applied. Consequently, we have discounted Peterson's 1991 figure by 3% and rounded it to the nearest million.)

■ In valuing open claims, we have selected the valuation by Peterson rather than that of Florence because in his valuations of closed cases, Florence used figures only from 1990 as applied to each category of disease. The evidence demonstrated that this is unsound, because in 1990, just prior to bankruptcy, debtors were settling cases at bargain figures because the plight caused by asbestos liability claims had become acute. Peterson, on the other hand, used for his figures for valuing each disease, average figures for the period 1980 to 1990. This was sensible because the open claims did not arise in 1990, but over a longer period of time.

While Beiser, the expert for the UCC, did not in his testimony state a figure for valuation of the open prepetition claims, as we have seen, he did give a basis for making such a calculation. P. 9, *supra.* We find his valuation faulty because he bases his values primarily on 1990 settlement figures of closed cases, though he said he also looked at settlement figures beginning with 1988. Additionally, we find his writing off of 16,000 claims to be unjustifiably arbitrary.

We summarized the testimony of Weil at some length above. It was intended by Weil

to demonstrate the invalidity of deriving values of open and future claims from the Eagle–Picher closed claims database. We will not, however, devote as much space to rejecting his analysis as we took to summarize it. In very large measure, his factors are negated by the careful and thorough analysis by Peterson of the closed claims, the results of which were not applied indiscriminately to the open claims, but only applied when there were matching factors. Weil's analysis is based on an assumption that the closed claims could only be useful if they were homogeneous and interchangeable, and if the open claims were of the same character. This thought overlooks the great care taken by not only Peterson, but Florence as well, in taking into account the many, many variables which come into play in evaluating the amount which could reasonably be assigned to a given claim based upon prior experience.

Finally, we comment upon Weil's thesis that he noticed that in their purchase of asbestos, debtors only purchased amosite, a category of asbestos, from 1947 to 1952, while the other purchases over the years were of a different variety, chrysotile. In connection with this distinction, Weil said (Tr. 11): "I have read in the public policy literature … some have said that the evidence is extremely strong that if you have mesothelioma it had to come from an amphibole type, it could not have come from a chrysotile type." (Evidently, amosite equates to amphiboles.) Weil, in part, based his testimony that liability of debtors' on account of asbestos claims is lower than estimated by other experts because debtors' purchase of amosite ceased in 1952. Weil's lack of qualification to testify as an expert about the effect of differentiating between types of asbestos fibers, coupled with the effective rebuttal testimony of Peterson that the distinction was long known and not generally recognized, persuades the court that this is not a factor which ought to be taken into consideration in the present process.

2. Estimating Future Claims.

While the estimation of value of the open claims, those pending against the debtors as of the filing date of the bankruptcy case, may be made with some degree of certainty because essential characteristics are known about each of them, estimation of the value of future claims requires a leap into the unknown. The future claims with which we will here be dealing are asbestos claims which will be filed against debtors after the filing date, January 7, 1991. (Earlier in the case, the court had defined future claims only as those filed after the bar date, September 30, 1992. For present purposes that definition is irrelevant, because the plan treats all postpetition claims as future claims to be compensated through the PI Trust. Parenthetically, for completeness, we are obliged to mention that the open prepetition claims also will be settled by the PI Trust.)

In arriving at an estimate for the number of future claims, all of the experts, except for Weil, recognized the work of an epidemiologist, Dr. Nicholson, as authoritative. In 1982, Dr. Nicholson with colleagues published a seminal work in which he estimated the number of people in the future who would file meritorious mesothelioma or lung cancer cases. Burke hired Nicholson to update these results to 1992. Given these results, based upon historical relationships, Burke and Peterson independently did a multiple regression analysis deducing the number of asbestos-caused illness other than mesothelioma and lung cancer that will be filed in the future. Once the number of claims for each disease for each year was known, and since a value for each disease derived from the closed cases could be applied to each of these claims, it was possible to arrive at a total figure for each year for each disease.

While the experts had slight variations in the final dates when claims might be made, the difference is not of great consequence because, as might be expected, in later years because of inevitable mortality, comparatively few claims will be made. The dates at which they place the cutoff date ranges from the year 2029, used by Burke and Beiser, to 2049, used by Weil, a date which he found being used in the Manville case.

We turn now to the testimony of the several experts regarding future claims.

Because Burke was retained by the FCR, his mission was limited to estimating a value

only for future claims, that is, for claims to be made against the debtors after the filing date, January 7, 1991. Burke hired Dr. Nicholson, the epidemiologist mentioned above. Dr. Nicholson's assignment was to forecast the number of people who, after January 7, 1991, would file a meritorious claim against the debtor until the year 2029. Nicholson responded to this assignment by furnishing Burke with the number of cases to be filed, classified by occupation and also by disease. He also estimated the number of claims to which no value could be assigned. Nicholson brought his 1982 study up to 1992 during his employment by Burke.

In addition to needing to know the number of cases to be filed in the future, properly classified by disease and occupation, Burke needed to know the amounts that the debtors had paid to claimants by the same classifications of disease and occupation in the closed cases, and this was supplied to him. In addition, Burke required information about the lag time between the filing of claims and the settlement of them. The reason for this is that this relates to the time of actual payment of a claim, and this affects the present value for that claim. The occupations for which classification was made were boiler maker, construction worker, pipe fitter, plant worker, refinery, railroad worker, ship yard worker, sheet metal worker, steel plant worker, insulator/pipe coverers. The disease categories utilized by Burke in his analysis were mesothelioma, lung cancer, asbestosis, pleural thickening, and other disease. Using occupation and disease in combination, Burke arrived at a value for any claim with a given combination of these factors.

With this information, Burke arrived at a total valuation of future claims of $2,561,927,562. This, however, is a raw figure. It was then necessary to arrive at a present value for that figure. To do that, Burke applied "an after-inflation [discount] rate of two-and-a-half percent." (Tr. 38.) His total valuation in 1993 dollars for future claims was $2,032,000,000. On cross-examination, Burke said that the value as of the filing date would be $1,910,397,943.

Florence explained his methodology. He said that he had information about the 141,000 pre-bankruptcy claims filed against Eagle–Picher based on exposure to asbestos, when first exposure took place, how long the exposure was, what the injury was, the age, and the date of diagnosis of the injury. In 1993 Eagle–Picher had information on about 40,000 of the 141,000 claims. Florence got additional information from Manville and UNR by means of matching social security and name of claimant. He was looking in those sources for the same five data items just listed above. By this analysis of closed claims, he arrived at a basis for valuing future claims.

Florence took six categories of disease, mesothelioma, lung cancer, other cancer, asbestosis, pleural abnormality, and other/unknown. He analyzed the 77,989 closed cases in the Eagle–Picher database and derived the number for each of the categories of disease in the closed claims database. Florence did not go into the details of his process.

The next step was to use the model developed by Nicholson for OSHA to estimate the number of people who were exposed to asbestos who will actually contract and die of mesothelioma or lung cancer as a result of their exposure. Once the number of people who will die from mesothelioma or lung cancer is obtained, the number of people who will make claims based upon the historical relationship between the fatal diseases and the non-fatal diseases can be determined. Florence used a regression model for this purpose. This resulted in a forecast of the number of mesothelioma, lung cancer, asbestosis, pleural and other cancer claims that would be filed against Eagle–Picher from 1994 to the year 2040.

Florence decided that the most recent experience, that for 1990, was the best basis for determining the cost of settling a claim, and so he used the injury averages for 1990 as the average base disposition cost per claim for valuing future claims.

But in addition to valuations based entirely on past experience, Florence testified that events had suggested that he increase his forecast of the number of future claims. In his forecast of future claims, Florence has

doubled the number of asbestosis and pleural abnormality claims. This, he says, is based upon the experience of UNR and Manville. He testified to an increase of 400% by UNR in 1994 over the prior year, and this trend is continuing this year. Florence's estimate of future claims without adjustment for increased filings perceived in other cases in 1994–95 (with some rounding) is $1,986,795,-000. His estimate, including an adjustment for increased filings, is $2,031,459,000. Both are stated in 1995 dollars.

Next we review the testimony of Peterson regarding future claims. In arriving at his estimate of the number of future claims, Peterson focused on the period 1991–1995. That period shows an increase in filings for OCF (Owens–Corning–Fiberglass), UNR, and Manville. Particularly, the ratio of non-malignancies to malignancies changed during this period with non-malignancies going up steadily.

Peterson's message was that the experience from 1991 to 1995 shows that there is an increase in total filings across the industry, and an increase in the proportion of these filings which were non-malignancies. This phenomenon continues today. Peterson opined that the trend will have to turn around at some point, but he cannot say when. Because of the increase in the number of non-malignancy filings 1991 to 1995, Peterson adjusts the historic ratios of five-to-one and seven-to-one of non-malignancy to malignancy cases, by increasing them 7% a year. By doing so, he testified that he would be imposing on Eagle–Picher a change comparable to what had happened in the industry generally.

Because of the uncertainty as to when the perceived trend would stop, Peterson made projections, first, assuming that the increase in non-malignancies would stop in 1995, and, second, assuming that it will continue until 1998. With each of those, 1995 and 1998 as a starting point, he then posits two assumptions, one assuming that the ratio of non-malignancies to malignancies will begin to decline, while the other does not assume such a decline.

Using these four assumptions, Peterson arrives at a value for each, and does so in 1991 and 1996 dollars. Since we value at filing date, we set forth only his 1991 value. His recommended (conservative) value for future claims assumes that the ratio of non-malignancy claims to cancers decreases from 1995 through 1998 and continuing to decrease thereafter. His value on this basis is $2,591,000,000. In arriving at his values, Peterson has adjusted his figures for present value. He carefully explained that on the one hand it is necessary to arrive at a value for a future claims, adjusting for inflation. He testified that he used DRI projections for inflation. Then he discounted the future figure for present value by using a 5.8% discount rate. (Tr. 367–8.)

A note must be made about a correction that Peterson makes. He has noticed that 77,000 claims were filed postpetition by the bar date. Forty-four thousand new names resulted from the § 341 order and the 33,000 were caused by the setting of the bar date, totaling the 77,000. He says that his projections would already have valued 40,600 of these with other claims. This leaves an additional 37,000 claims that were filed in response to the orders. As to the 37,000 claims, Peterson discounted them by 70% and gave them an aggregate value of $75 million for 1991 dollars, which should be added to the prior figure.

As we have seen, Beiser departed from the methodology employed by the other expert witnesses in that he did not arrive at a separate valuation for the open prepetition claims. Instead, he arrived at an indemnity value, $6,300. He applied this value to a total number of claims both prepetition and future. He found that there were 288,000 future claims. Having done this, he then explains that 2% was an appropriate indemnity growth rate, his means for estimating the value of a claim in the future comparable to what it would be worth today. He then factored in a three-year cycle for disposition of claims. Finally, he applied a discount rate to bring future claims back to present value. To do this, he arrived at a "risk adjusted rate." The rate he used was the range 9½ to 11½ percent. He explained (Tr. 599) why he used this. He said "We analyzed really where the asbestos liability stood in terms of

priority within the company's capital structure, recognizing it is a general unsecured claim of the company's, and we looked at what would be an appropriate discount rate for any claim or any liability that Eagle–Picher had that was in that same area in the company's capital structure and determined that to be in the 9½ to 11½ percent range." He also did a calculation assigning a value of $88 million to claims of lesser severity or having no merit. This essentially was the methodology by which he arrived at a valuation for the future claim component of his total for all claims prepetition and future, in the range of $800 million to $1 billion.

This was the only method employed by Beiser at the time that his deposition was taken shortly before the evidentiary hearing. Subsequently, he developed three other "approaches," which he testified gave him a comparable result. The first he called a "liability share analysis" which led him to estimate $1,200,000,000 for total value of claims. This approach is based upon first arriving at a figure for total asbestos liability and then arriving at an appropriate share for Eagle–Picher. His second "approach" is a comparable company analysis. There he arrived at a valuation of $1,200,000,000 based upon computations he made comparing Eagle–Picher to Fiberboard, Manville, UNR, and National Gypsum. His fourth "approach" evidently is based upon an analysis of the UNR Trust payments and building on those payments, calculating what the claims of Eagle–Picher might be which would lead to such payments.

In Weil's analysis of the cost of future claims, a basic premise is that the UNR Trust has settled with 89,342 claimants who match with debtors' claimants, and $1,158 is the average for those claims. Weil adjusted that number to $1,348 to take into account disease mix. He stated (Tr. 839) "the basic idea is to figure out what is the projected future claim cost per claimant and how many claimants will there be, multiply those two together."

He arrived at a projected future claim cost per claimant of $262. This is 19.4% of $1,348. The rationale for the 19.4% is that that is his estimate of the Eagle–Picher market share for future claims. He then looked at the number of future claimants estimated by four sources, including Burke and Peterson, Burke being 325,798 and Peterson 475,017, to arrive at future claim values. Using the Burke number gives $85,395,276 as a result. Using the Peterson number, the result is $124,507,234.

Weil testified that he had considered another alternative to estimation before he got the UNR data. This alternative was based on the Manville experience. Based on that, he had derived 333,467 future claims for Eagle–Picher. He computed total Manville costs of $25 billion, compared the Eagle–Picher market share to that of Manville, and got a total cost for Eagle–Picher of $1,045,322,113. Weil concluded his testimony at the hearing before this court by saying that he does not recommend this valuation, but rejects it in favor of his value based on the UNR experience. We note that this alternative is all that the other parties were informed of prior to the time that Weil's deposition was taken, which was shortly before the hearing, and prior to the time that the required summary of expert testimony was provided to the other parties.

Worth noting for its forthrightness is the following testimony by Weil (Tr. 901):

Q. When you establish your values per claim, you used the values paid by the UNR Trust as the basis for valuing Eagle–Picher claims, didn't you?

A. Yes.

■ After considering the evidence and the testimony of the experts, the court has concluded that a qualitative statement of the considerations which should enter into an estimate of future claims should include the following considerations:

1. The estimate should be primarily based upon the history of *this* company, particularly because there was no definitive showing of another or other company's production of a product line identical to that of debtors. This consideration does not, however, rule out the desirability of considering trends general to the industry, particularly regarding the rate of filing of claims.

2. The total number of claims to be expected should be estimated.

3. The estimation of claims should categorize them by disease and occupation, as well as other factors.

4. Valuation of claims should be based upon settlement values for claims close to the filing date of the bankruptcy case, January 7, 1991. The reason for this is that over the years prior to the filing of bankruptcy, the average settlement amounts of Eagle–Picher closed claims declined. This is to be seen in the graphs at p. 23 of FCR Ex. 1, UCC Ex. G, and EC Ex. 13. We can accept valuation based upon settlement values in 1990 notwithstanding that the evidence was that settlements at that time were being discounted by Eagle–Picher, because it can be regarded as offsetting the decline of settlement rates of future claims which are to be expected. This analysis is not inconsistent with the perception by Florence and Peterson of an upward trend in settlement values in the years 1991–95, because both these experts treated that as a temporary condition.

5. A reasonable rate for indemnity increase with time must be determined so that a future value of filing date indemnity values can be comparable.

6. A lag time gleaned from the tort system must be determined in order that there be accuracy in projecting future values.

7. A discount rate must then be applied in order to bring the future nominal value of claims back to the filing date.

It is our opinion that the estimate of future claims by Florence as reflected in debtors' Exhibit 3, p. 404–D, comes closest to meeting the criteria we have just enumerated. The only respect in which it does not meet these criteria is that it states a value in 1995 dollars and consequently this must be reduced to the present value approximating the filing date. His estimate in 1995 dollars for future claims from the filing date onward is $2,631,458,688.

The Burke estimate meets most of the criteria set forth above, but is deficient in recognizing the increasing trend of filings testified to by both Florence and Peterson in the recent period. Additionally, his application of a 2½ net discount rate is unsubstantiated, for he has failed to inform us of the indemnity increase and discount rate which he employed to reach that net figure. The indemnity increase and discount rates which we approve do not support such a net figure. We find the Peterson estimate flawed because it is based upon indemnity values averaged over the decade of the 1980's, a basis we stated above to be inappropriate. Future valuation must be based upon indemnity values being paid in and around the filing date, as both Burke and Florence have done.

The Beiser estimate is rejected on several grounds. As we have already seen, we find his indemnity value derived from the closed prepetition claims to be unsupported. In addition, he utilizes a discount rate in the range of 9½ to 11½%, which we hold to be excessive. The basis for this rate is that in his view this is where the asbestos liability of the debtors stood in terms of priority within the company's capital structure and he determined the appropriate discount rate for any liability in that area (Tr. 598). This analysis is unsound, for it is not the pre-bankruptcy debtors which will be responsible for the disposition of future claims. Rather, will it be the PI Trust, an entity which will be created by a confirmed plan, and the resources of which are in no way comparable to those of the debtors. Beiser reinforces the value which he derived by his "discounted cash flow" approach by reference to three other "approaches." The first of these is a liability share approach, while the second is a comparable company analysis approach. We are unpersuaded by either of these analyses. To have any degree of validity, direct comparability of product as well as period of asbestos operation must be displayed, and the evidence by Beiser discloses neither. His fourth "approach", his trust approach, is at odds with the task at hand of estimating the value of claims as of the filing date. It is instead really a determination of feasibility in the event that the PI Trust were funded at $1 billion, and has nothing whatever to do with estimation of claims.

Finally, we need only comment summarily about the testimony of Weil in respect

to future claims. What he has presented us with as an estimate of the value of future claims, is the amount that the UNR Trust actually paid out to claimants on claims where the claimant matches those in the debtors' database. This is simply not the same thing as estimating the value of future claims as of the filing date of the bankruptcy case.

■ To reach a conclusion as to an estimate of the value of future asbestos claims as of the filing date of the bankruptcy, it is necessary to reduce the figure arrived at by Florence in 1995 dollars, $2,631,458,688, by an appropriate discount rate. As we have stated, we reject the discount rate employed by Beiser as excessive. Florence has suggested a 6.3% discount rate, while Peterson employs a 5.8% discount rate. Both Florence and Peterson understood these to approximate the current risk-free discount rate, and we accept their testimony. We think it fair to employ for present purposes a discount rate of 6%. Utilizing that rate, the value for future claims arrived at by Florence reduces to (with some rounding) $2,024,511,000. (In arriving at this figure, we have assumed that Florence's 1995 valuation was as of mid-year, and consequently have reduced for four and one-half years. We have arrived at a value as of the beginning of 1991 of Florence's 1995 figure by applying the well-known formula, of which we take judicial notice, for calculating present value $PV + FV/(1 + r)^n$ where PV represents present value, FV represents future value, r represents discount rate, and n represents the time period for which discount is being made. This formula was applied by Burke at Table 51 of FCR Ex. 1.)

■ Combining our estimate for the open prepetition claims and the future claims we arrive at a total estimated value for asbestos claims as of the filing date of $2,502,511,000.

With regard to the motion of the UCC for initiation of information gathering procedures to which reference was made on p. 2 above, it is self evident that it is the view of this court that because of the depth of information provided by debtors' closed claims database, reliable information for the valuation of claims is available without further

information. It is only as to that dimension of estimation that additional information could conceivably be useful. We find it to be unnecessary. Sampling, further information gathering, can provide no better information than what is presently available. We therefore deny the motion of UCC for further information gathering.

So Ordered.