**In re KEWANEE BOILER COR-
PORATION, n/k/a OakFab-
Co, Inc., Debtor.**

**KEWANEE BOILER CORPORATION,
n/k/a OakFabCo, Inc., Plaintiff,**

**v.**

**Kenneth E. SMITH, Defendant.**

**Bankruptcy Nos. 86 B 16937, 95 A 00999.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 11, 1996.

Robert D. Nachman and Todd L. Padnos, Schwartz Cooper Greenberger & Krauss, Chicago, IL, for Plaintiff.

Lawrence Fisher and Timothy R. Casey, Gardner Carton & Douglas, Chicago, IL.

Curtis E. Kimball, Rudman & Winchell, Bangor, ME, Robert W. Glantz, Ross & Hardies, Chicago, IL, for Kenneth Smith.

## MEMORANDUM OPINION

JACK B. SCHMETTERER, Bankruptcy Judge.

This proceeding relates to the bankruptcy proceeding filed by Kewanee Boiler Corpora-tion ("Kewanee" or "Debtor") under Chapter 11 of the Bankruptcy Code (the "Code"). 11 U.S.C. § 101 *et seq.* It exited successfully out of bankruptcy under the name OakFab-Co following confirmation of Debtor's Plan of Reorganization ("Plan"). Thus, while the re-organized Debtor has a new name, it is the same corporate entity.

On August 23, 1995, OakFabCo filed the present two-count Adversary Complaint against Kenneth Smith ("Smith"), seeking to enjoin his suit against OakFabCo which he filed in state court on various product liabili-ty theories. OakFabCo asserts that Smith is bound by its confirmed Plan even though he was injured long after confirmation. It moved for summary judgment on both counts. Smith cross-motioned for summary judgment on those same counts. For rea-sons set forth below, Smith's Motion for Summary Judgment is allowed while that of OakFabCo is denied.

Both sides complied with requirements of Local Bankruptcy Rule 402.M and N. Affi-davits, memorandums of law, statements of undisputed material facts, and responses thereto were filed by both parties. From these filings and the record of proceedings herein, the following material facts are found to be uncontested:

### Uncontested Facts

Kewanee Boiler Co. manufactured boilers for many years before it filed for bankruptcy protection under Chapter 11 of the Bank-ruptcy Code on October 1986. Kewanee's Second Amended reorganization plan (the "Plan") was confirmed on March 17, 1988. The reorganized company is now known as OakFabCo.

The Plan did not expressly provide any payment to persons injured by Kewanee's products before or after its reorganization. The term "claim" was not defined in the disclosure statement. Class 6 claims are de-fined in the Plan as "[a]ll unsecured claims, other than those in Classes 1, 2, 3 and 4, including those claims arising from the rejec-tion of executory contracts or unexpired leas-es." Reorg. Plan, Art I. Class 6 claims were to be paid under the confirmed Plan pro rata out of a sinking fund made up of

annual payments by OakFabCo for a period of six years (1988–1994) amounting in each year to 60% of its net cash flow. Reorg. Plan, Art. II, § 2. While an Unsecured Creditor's Committee was appointed to represent interests of scheduled creditors and others who might file claims, no one was appointed to represent claims of any persons who might be injured in the future, post-confirmation, from defective boilers produced by Kewanee pre-petition or otherwise. It is estimated that this sinking fund will end up paying unsecured creditors about 6% of their claims as finally allowed. Since the amount of the fund is fixed, the inclusion of Smith's claim would, if he prevails on it, reduce the pro rata recovery by other creditors and sharply reduce his actual dollar recovery.

Sometime in 1952, OakFabCo manufactured a boiler which was installed at the Connors School in Bar Harbor, Maine. In 1969, Smith began working at the Connors School as a janitor and maintenance person. He operated and maintained the school's boiler until November 1989. In November 1989, about 20 months after OakFabCo's Plan was confirmed, Smith was injured when he was attempting to tighten a washout plug on the Kewanee manufactured boiler. He contends that the washout plug gave way and led to the release of water and steam which burned him.

In December of 1990, two years and eight months after confirmation, the claim bar date was reopened on motion of OakFabCo to extend time for filing of additional claims by creditors not earlier notified of the bankruptcy. That date was extended to March 31, 1991. No notice was given to Smith about the pendency of the bankruptcy proceeding, nor was he then sent notice that the claim bar date was extended.

In January of 1991, Smith filed a complaint in a Maine state court against OakFabCo sounding in negligence, product liability, breach of warranty of merchantability, and failure to warn. OakFabCo was served with summons and complaint on January 14, 1991. Its counsel responded by letter to Smith's counsel, acknowledging receipt of summons and complaint, but asserting that § 524 of Title 11 U.S.C. effectuated an injunction against Smith's suit because of Kewanee's earlier bankruptcy proceeding and the confirmation order. The letter also noted that the bar date for filing claims against Debtor in the bankruptcy proceeding would expire on March 15, 1991.

Subsequently, on March 15, 1991, Smith filed his Proof of Claim in the Kewanee bankruptcy, stating that "the ground for liability is damages from personal injuries inflicted by a release of steam and boiling water from a defective boiler manufactured by Debtor [Kewanee]." In his claim, Smith also requested that administrative priority be given to his claim since the claim allegedly arose from the wrongful act of a debtor in possession.

In the late spring and summer of 1991, representatives of both Smith and OakFabCo tried to negotiate the possible resolution of Smith's claim. In the meantime, Smith continued his prosecution of the Maine action. After Smith filed his claim in the bankruptcy case, OakFabCo's attorney disregarded the Maine action. No appearance or pleading was filed therein on behalf of Defendant. Smith was able to prosecute and obtain a default judgment of $966,000 in that action without further notice to OakFabCo. That default judgment was entered against OakFabCo in February 15, 1994. Debtor's Memorandum (filed March 11, 1996) reports that such judgment has since been vacated on its motion in the state court.

OakFabCo objected to various claims filed in response to the extended bar date in late 1993. January 28, 1994, was the last day set for filing objections to any of those new claims filed. OakFabCo did not object to Smith's claim by that date. However, on April 4, 1994, several months after the bar date set for filing objections to claims and two years after Smith filed his claim herein, OakFabCo's counsel sought leave to file a late objection to Smith's claim.

On May 2, 1994, Smith responded by moving to withdraw the claim he had filed March 15, 1991. On May 6, 1994, before OakFabCo was allowed to file its objection to the claim, Smith was allowed by order to withdraw that claim for reasons then stated from the bench.

On August 23, 1995, the same date the present Adversary Complaint was filed, OakFabCo also filed a motion to have the May 6, 1994, order vacated. It argues that the order allowing Smith to withdraw his claim should be vacated because Smith intended to mislead the Court and OakFabCo regarding his intent to liquidate his claim outside the bankruptcy court. That motion is denied for reasons set forth below.

Additional uncontested facts are set forth in the discussion that follows.

### Litigation Issues

In Count I of the Complaint OakFabCo seeks judgment declaring that the Maine default judgment is void. Count I also seeks to enjoin Smith from collecting on his claim outside of the bankruptcy proceeding. In Count II, OakFabCo seeks a determination that Smith holds a pre-petition claim discharged upon confirmation of Kewanee's Plan of Reorganization on March 10, 1988, except to the extent of any rights he may have as a creditor under the confirmed Plan. OakFabCo asserts that § 524(a)(2) of the Code enjoins Smith from collecting on his claim from the reorganized Debtor (OakFabCo). It also seeks damages for Smith's purported violation of the § 524(a)(2)'s statutory injunction. However, OakFabCo's main contention in Count II is that, if Smith can prove that Kewanee is liable for his accident, he can only be paid out of the sinking fund created for claims by Kewanee's Plan of reorganization, not out of current assets of the reorganized company.

Such indeed is the kernel of this case. If Smith is relegated to satisfying his claim only by participating in Kewanee's bankruptcy, his recovery will be much lower. Otherwise, he will (if his suit prevails) collect out of current company assets and income. No insurance coverage applies, and OakFabCo suggests that recovery by Smith from the reorganized Debtor would affect funds paid into the sinking fund. Six years since Plan confirmation have long since passed, and required deposits into that fund have been made. It has not been demonstrated that recovery by Smith from current assets or income during years subsequent thereto will affect any retrospective adjustment of payments due other creditors under the confirmed Plan.

It is inferred by Debtor, but not demonstrated, that net cash flow held back for the six years that have now passed must, under the confirmed Plan, be held back from distribution to pre-petition creditors until the Smith claim is satisfied. OakFabCo claims Smith must share in those funds. However, there is nothing in Smith's position that claims a right to share in the Bankruptcy Plan sinking fund. Therefore, it has not been necessary to discuss at length the fact that any claims by Smith hereafter that impact the sinking fund or attempt to attach it would implicate the core jurisdiction of this Court and raise different and serious questions within that jurisdiction to protect and enforce the confirmed Plan. Smith's position as presented here is compatible only with attempts to collect from current assets of OakFabCo, including profits after the expiration of the six years to which the Plan sinking fund is limited or other sources not due to or paid into the sinking fund.

Smith points out that the explosion that injured him occurred after Kewanee filed its bankruptcy petition and indeed long after the Plan was filed and confirmed without any attempted notice to him. He did not, and of course could not, participate in the bankruptcy. As a result of the timing of his accident, he asserts a post-petition claim which is not subject to Kewanee's Plan. He therefore seeks summary judgment on both counts of the Complaint which would allow him to pursue his suit against OakFabCo, the reorganized debtor.

Debtor's argument suggests that Smith held a contingent or unmatured claim against Debtor before bankruptcy was filed because he worked with equipment that Smith claims was defectively manufactured, even though this claim did not ripen until the post-confirmation accident. Thus, it contends he must be bound by the confirmed Plan.

This case raises a number of questions having significance to our system of bankruptcy generally as well as to Smith's rights:

Could Smith have held a claim bound by confirmation in Kewanee's bankruptcy when he was injured 20 months after the confirmation order? Did Congress intend to define "claim" so broadly that it includes all claims which may at anytime arise out of a debtor's pre-petition conduct? Should the answers be different for a reorganized debtor than for a liquidating debtor?

What kind of future claims are capable of resolution in the bankruptcy process? Can future injury victims ever receive due process treatment or proper bankruptcy notice in a bankruptcy proceeding where they necessarily cannot be present? And what if, in hindsight, a claim was capable of such treatment but was not actually addressed in the bankruptcy Plan?

### *Summary Judgment Standards*

■ Under Fed.R.Civ.P. 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

■ On a summary judgment motion, inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987). Moreover, the existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Howland v. Kilquist,* 833 F.2d 639, 642.

■ Each party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motions and must identify those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. However, once the motion for summary judgment is made and supported as described above, a party opposing the motion may not rest upon the mere allegations or denials in pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553–54; *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356–57. When the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356–57.

■ Although both parties argue for summary judgment, that does not by itself indicate that there are no genuine issues of material fact. The court must rule on each motion separately in determining whether each judgment may be entered in accordance with applicable principles. *ITT Indus. Credit Co. v. D.S. America, Inc.,* 674 F.Supp. 1330, 1331 (N.D.Ill.1987) (Shadur, J.). *See* C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* § 2720 (2d ed. 1983 & Supp.1987). Indeed, both motions should be denied if both parties fail to meet their burden. *ITT Indust. Credit Co. v. D.S. America, Inc.,* 674 F.Supp. 1330, 1331 (N.D.Ill. 1987). *See also* C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* § 2720 (2d ed. 1983 & Supp.1987). However, that is not the case here.

### *DISCUSSION*

### *Introduction*

In Count I, OakFabCo seeks declaratory judgment holding that the default judgment obtained by Smith in Maine on February 15, 1991, is void and that collection of that judgment outside this bankruptcy case is barred.

The grounds asserted [1] apparently persuaded the Maine court to vacate the judgment, and this Count may therefore be largely moot. Because the parties continue to dispute in Maine over the effect of the state court's vacating order, the Count is not entirely moot and therefore should be ruled on.

Count II seeks a declaration that Smith's Maine suit is barred and enjoined under § 524(a)(2) of the Bankruptcy Code and applies for orders enforcing such restraint.

For reasons stated below, Smith's claim is found not to be a claim affected or limited by Kewanee's bankruptcy. After confirmation, pre-bankruptcy claims against the reorganized debtor were limited under 11 U.S.C. § 524 to what is permitted by the Plan. But such limitation does not apply to Smith's post-bankruptcy claim.

Summary judgment will be granted in favor of Smith on both counts because he has a right to liquidate his claim unlimited by the bankruptcy. This Court has no jurisdiction over his post-bankruptcy claim. Therefore, whether Smith is entitled to enforce his default judgment or collect at all is entirely up to the Maine court. That right is in no way restricted by Kewanee's bankruptcy for reasons stated below. All attacks by OakFabCo on Smith's judgment and suit must be addressed to the state court.

### *Jurisdiction*

The Debtor–Plaintiff asserts that this court has core jurisdiction under 28 U.S.C. § 157(b)(2)(B), (C), and (I). Sections (B) and (C) involve claims against the estate and counterclaims thereto, Section (I) relates to dischargeability of debt. This action does not seek to adjudicate dischargeability of Smith's claim, only a restriction of the amount he many collect, so (I) does not apply by its terms. Smith has withdrawn any claim against this estate and no counterclaim lies against him, so (B) and (C) do not apply.

However, § 157(b)(2)(L) (relating to confirmation of plans) potentially provides core jurisdiction here.

■ A bankruptcy judge has jurisdiction to interpret, apply, and enforce a plan confirmed under its jurisdiction. *Public Service Co. of New Hampshire v. Richards (In re Public Service Co. of New Hampshire)*, 148 B.R. 702, 705 (Bankr.D.N.H.1992); *Matter of Specialty Equipment Companies, Inc.*, 3 F.3d 1043, 1045 (7th Cir.1993).

■ Indeed, federal courts have jurisdiction to enforce their own orders. *Local Loan Co. v. Hunt*, 292 U.S. 234, 239, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934); *In re White Motor Credit Corp.*, 75 B.R. 944, 947 (Bankr. N.D.Ohio 1987).

Whether emanating from the general power of courts to enforce their decrees, see generally 11 U.S.C. § 105(a), or from specific bankruptcy code sections such as 11 U.S.C. § 1112 (allowing for conversion or dismissal after confirmation), § 1127 (allowing for plan modification after confirmation, § 1142 (allowing for revocation of confirmation), there exists a residue, albeit limited, of court authority over a confirmed plan chapter 11 case.

*In re Cinderella Clothing Indus., Inc.*, 93 B.R. 373 (Bankr.E.D.Pa.1988).

Debtor asserts that it seeks to apply and enforce the confirmed Plan against Smith, and determining whether it is entitled to do so therefore lies within core jurisdiction.

The Plan here did not contain an express injunction limiting lawsuits brought against the reorganized debtor. Were the Plan to contain such a post-petition injunction, the holding of *Zerand–Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir.1994), casts doubt on whether this Court possesses the subject

---

**1.** It charges that Smith's acts of filing a claim in the bankruptcy court and entering negotiations with OakFabCo to have its claim go unchallenged in the bankruptcy proceeding somehow unlawfully induced OakFabCo to cease opposing the Maine action. As further evidence of this purported scheme, OakFabCo alleges that Smith's counsel did not mention to this Court the Maine default judgment at the May 4 hearing held to determine whether Smith could withdraw his bankruptcy claim and whether OakFabCo could file an objection to that claim. OakFabCo allegedly learned of the Maine judgment only on March 7, 1995, when Smith's attorney followed procedures to collect the state court judgment. This conduct is said to have deprived OakFabCo of its ability to contest the Maine action.

matter jurisdiction to enforce an order enjoining persons injured post-petition by a product manufactured by a debtor pre-petition. In *Zerand–Bernal,* the Seventh Circuit found that a bankruptcy court does not have subject matter jurisdiction to enjoin a lawsuit filed by a person injured by a debtor's product post-petition. The debtor's assets in that case had been sold under 11 U.S.C. § 363(f) to another business, and the sale agreement sought to enjoin any future lawsuits against the acquirer of debtor's assets. The *Zerand–Bernal* decision found that the bankruptcy court did not have "related to" or "arising under" jurisdiction to restrain a lawsuit "whether by or against the debtor." *Id.* at 161. The court found no "related" jurisdiction since "the debtor no longer exists, all its assets have been transferred to Zerand pursuant to the plan of reorganization [and because] the suit cannot possibly affect the amount of property available for distribution to [debtor's creditors]; all of [debtor's] property has already been distributed to them." *Id.* at 161. Furthermore, the court found no "arising under" jurisdiction. *Id.* at 161–62.

The holding of *Zerand–Bernal* cannot be squarely applied here to dispose of the instant case, because the suit there was against the buyer in bankruptcy of debtor's assets. No such sale occurred here. However, the jurisdictional question there is a serious issue here under the same rationale.

### Did Smith Have a Pre–Petition "Claim" Barred Under § 524(a)(2)?

 Bankruptcy Code § 524(a)(2) states:

 (a) A discharge in a case under this title-
 (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived;

Section 524(a)(2) operates automatically to void any judgment obtained by a creditor of the estate before or after a discharge order. 3 Collier on Bankruptcy, ¶ 524.02, 524–10 (15th Ed.1994). However, § 524(a)(2) only applies to pre-petition claims. *Millsaps v. United States (In re Millsaps),* 133 B.R. 547,

552 (Bankr.M.D.Fla.1991). Thus, if Smith held a pre-bankruptcy "claim" as defined by § 101(5) of the Bankruptcy Code against Kewanee Boiler at the time or before Kewanee filed its petition, then § 524(a)(2) would operate to void Smith's judgment and block his suit unless he were otherwise permitted to liquidate his claim in state court. Smith would then have to share in the very limited distribution provided for all of Kewanee's pre-petition creditors.

Smith argues that he never held a pre-petition claim because his injury occurred post-confirmation, actually more than a year after Kewanee's plan of reorganization was confirmed.

Although Smith was not injured until long after Kewanee's plan was confirmed, Oak-FabCo argues that Smith holds a pre-petition claim under the broad Bankruptcy Code definition of "claim" in § 101(5), which includes interests that may yet be "contingent" and "unmatured."

An essential element of the Code's scheme for a broad discharge is its expansive definition of "claim." *In re Johns–Manville,* 57 B.R. 680, 686–87 (Bankr.S.D.N.Y.1986).

Leading up to the 1978 amendment to broaden that definition, the House of Representatives Committee on the Judiciary explained the purpose:

 H.R. 8200 abolishes the concept of provability in bankruptcy cases. All claims against the debtor, whether or not contingent or unliquidated, will be dealt with in the bankruptcy case. This is the procedure under current chapters IX and X. However, under the liquidation chapters of the Bankruptcy Act, certain creditors are not permitted to share in the estate because of the non-provable nature of their claims, and the debtor is not discharged from those claims. Thus, relief for the debtor is incomplete, and those creditors are not given an opportunity to collect in the case on their claims. The proposed law will permit a complete settlement of the affairs of a bankrupt debtor, and a complete discharge and fresh start.

H.R. 8200, 95th Cong., 1st Sess. § 101(4)(A) (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6141.

The Report that accompanied the Senate version of the amendment explained that the new definition was intended to encompass contingent and unliquidated claims not provable under the old Bankruptcy Act. S.Rep. No. 989, 95th Cong.2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5781, 5807–08. The intent and effect of the new definition was a significant departure from former law. Under the Bankruptcy Act, the definition of "claim" had been used, along with the concept of provability in § 63 of that Act, to limit the kinds of obligations payable in a bankruptcy case. The amended definition was intended to include any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. By that broadest possible definition and by use of the term "claim" throughout Title 11, the proposed amendment was intended to ensure that all legal obligations of the debtor, no matter how remote or contingent, would be dealt with in the bankruptcy case. It was to permit the broadest possible relief in the bankruptcy court. *Id.*

As enacted, § 101(4)[2] virtually duplicated the language of the Senate Report, and defined a claim as a—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

The only notable limitation on the definition of "claim" in bankruptcy is that it must rest on a "right to payment."

This broad definition of "claim" meshes with the claims allowance process of Bankruptcy Code § 502. For example, Section 502(c) explicitly provides for estimation of contingent or unliquidated claims. The interaction of §§ 101(5) and 502(c), along with operation of the automatic stay under § 362(a), usually gives authority for bankruptcy courts to deal comprehensively with all facets of reorganization. *In re Johns–Manville Corporation,* 57 B.R. 680, 687 (Bankr.S.D.N.Y.1986).

Partly because of the foregoing legislative history and partly because of the impact of mass tort litigation, the case at hand is illustrative of a rapidly developing and complex area of bankruptcy law involving competing policies under the Bankruptcy Code.

One such policy consideration is the influence that future liability has on a debtor's assets. Being able to account for injuries caused by a debtor's product and limit collection to assets devoted to the bankruptcy estate effectively frees debtor's assets not committed to the reorganization from liability for tortious acts. It is argued that such a cleansing of assets enhances their value by reducing liability exposure of reorganized debtors. Enhancing value of assets raises the chances that such assets will be kept together as a going concern thereby arguably raising the amount that creditors, including tort victims, can recover for their claims. A broad interpretation of "claim" is said to give debtors a more effective reorganization by shielding reorganized businesses or their purchasers from future lawsuits. Moreover, the continued flow of cash may increase the distribution that creditors may get on their claims. If a debtor is forced into liquidation because the burden of liability prevents a reorganization, persons injured by a debtor's products after the liquidation is complete cannot recover anything. It is said that such persons should get no better treatment than those injured pre-petition. Accordingly, it is argued that as many claims as possible should be resolved in the bankruptcy proceeding in order to enhance value of Debtor's assets and permit the Debtor to reorganize and remain viable.

**2.** On Nov. 29, 1990 subsection § 101(4) was re- designated § 101(5) by Pub.L. 101–647.

Equality and fairness among creditors is another policy cited in support of dealing with all persons holding future tort claims arising out of pre-petition conduct in one bankruptcy proceeding. Indeed, assuring that similarly situated creditors receive equal pro-rata distributions is a fundamental concept in the Bankruptcy Code. *Union Bank v. Wolas,* 502 U.S. 151, 154, 112 S.Ct. 527, 533, 116 L.Ed.2d 514, 524 (1991), *quoting* H.Rep. No. 95–595, pp. 177–178, U.S.Code Cong. & Ad.News 1978, pp. 5787, 6138. Allowing tort claimants to sue the reorganized debtor because, by fortuity, their injury occurred post-petition or post confirmation would give these creditors different and likely higher distributions on their claims. The instant case is good example of this. Had Smith been injured before the bankruptcy filing, he would have been given an opportunity to file a claim and would have had to participate in the Kewanee bankruptcy in order to collect anything on his claim. As such, he would have been an unsecured creditor and would have recovered only about 6% of the amount of his claim as liquidated.

By chance Smith was injured later. Also by chance he was injured by a boiler manufactured pre-bankruptcy. If successful in Maine, he may be able to recover the whole amount of his liquidated claim against OakFabCo. Absent insurance, such recovery will come out of current profit or assets. It is argued that this result would be unfair to pre-petition claimants who must be satisfied out of the unsecured creditors' sinking fund.

Such "unfairness," however, is more apparent than real. Life is filled with fortuities. It was a fortuity that the boiler involved in that accident was manufactured pre-petition, and it was a fortuity that Smith was hurt at all. The law must deal with events as they actually occurred. In this case, Smith had no § 101(5) "right to payment" at all under nonbankruptcy law at any time prior to Debtor's confirmation and therefore had no pre-petition or pre-confirmation "claim" under that provision. His future claim was therefore not "contingent" or "unmatured" in any legal sense pre-petition or pre-confirmation. Debtor had no debt to him at all, even if (as asserted in the Maine suit) it had a duty under tort law to warn of some possible danger. In short, until the accident, Smith had no "claim" under § 101(5) against Debtor. *In re UNR Industries, Inc.,* 29 B.R. 741 (N.D.Ill.1983), *appeal dismissed, Matter of UNR Industries, Inc.,* 725 F.2d 1111 (7th Cir.1984).

Clearly persons whose injuries manifest themselves before confirmation have "claims" under the § 101(5) definition, even if liability or damages are still unresolved. *Paris Manufacturing Corp. v. Ace Hardware Corp. (In re Paris Industries Corp.),* 132 B.R. 504, 508 (D.Maine 1991). It is also clear that where persons are injured by post-confirmation activities of a reorganized debtor, they have no pre-petition claim.

The problematic case arises where debtor's pre-petition conduct injures a person after confirmation, as is alleged by Smith. There the person injured does not have a cause of action under state law or any right to payment until after the plan is confirmed and after all pre-petition debts are barred except as provided for by the plan.

A Third Circuit panel has found that a person injured by a debtor's pre-petition acts holds a claim in bankruptcy only if his claim has accrued pre-confirmation under state laws. *Avellino & Bienes v. M. Frenville Co. (Matter of Frenville Co., Inc.),* 744 F.2d 332, 335–36 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). Although it rested with good reason on the requirement of a "right to payment" under § 101(5), the *Avellino* test has been criticized as inconsistent with the intended breadth and scope of § 101(5). *See, e.g., Grady v. A.H. Robins Company, Inc.,* 839 F.2d 198, 201 (4th Cir.), *cert. dismissed,* 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988). Such criticism, if followed, would leave no meaning in the requirement under § 101(5) that a "claim" rest on a "right to payment."

### Would Plan Limits on Smith's "Claim" Violate Due Process and Required Bankruptcy Notice?

■ Even if a contingent "claim" could by some stretch of § 101(5) be held by Smith pre-petition, this would raise other serious questions under the Code and Constitution. Such ruling would force Smith to be bound

by proceedings in which he did not and could not participate. Fifth Amendment Due Process concerns are clearly at issue in a case like this, as well as notice requirements under the Code.

 Notice is the cornerstone underpinning Bankruptcy Code procedure. *Western Auto Supply v. Savage Arms, Inc., (In re Savage Industries, Inc.)*, 43 F.3d 714, 719 (1st Cir.1994). The debtor in possession or trustee must ensure that "parties in interest" must be given adequate notice and opportunity to be heard before their interests may be adversely affected. Most pertinent here are 11 U.S.C. § 1109(b) ("parties in interest" have "right to be heard" in chapter 11 case), and the requirement in § 1128(a) of notice to parties to be bound by a proposed Plan. The term "parties in interest" encompasses not only entities holding "claims" against the debtor, but any entity whose pecuniary interests might be directly and adversely affected by the proposed action. *See, e.g., Yadkin Valley Bank & Trust Co. v. McGee (In re Hutchinson)*, 5 F.3d 750, 756 (4th Cir.1993); *In re Athos Steel & Aluminum, Inc.*, 69 B.R. 515, 519 (Bankr.E.D.Pa.1987). "[N]otice ... means ... such notice as is appropriate in the particular circumstances...." Bankruptcy Code § 102(1), 11 U.S.C. § 102(1); Fed.R.Bankr.P. 2002(k) (empowering court to order publication of notice to "parties in interest" where "desirable" or notice by mail is "impracticable").

As held in this Circuit and by the Supreme Court, the Fifth Amendment to the Constitution also requires meaningful notice to afford due process:

> It is universally agreed that adequate notice lies at the heart of due process. Unless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose—and resembles more a scene from Kafka than a constitutional process.

*Chicago Cable Communications v. Chicago Cable Commission*, 879 F.2d 1540, 1546 (7th Cir.1989), *quoting Cosby v. Ward*, 843 F.2d 967, 982 (7th Cir.1988). *See also Peralta v. Heights Medical Center, Inc.*, 485 U.S. 80, 85, 108 S.Ct. 896, 899, 99 L.Ed.2d 75 (1988), *quoting Armstrong v. Manzo*, 380 U.S. 545, 550, 85 S.Ct. 1187, 1190, 14 L.Ed.2d 62 (1965) ("Failure to give notice violates 'the rudimentary demands of due process of law' ").

"Reasonable notice" is defined by the Supreme Court as "notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). *See also Peralta v. Heights Medical Center*, 485 U.S. at 85, 108 S.Ct. at 899, and *Greene v. Lindsey*, 456 U.S. 444, 449–50, 102 S.Ct. 1874, 1877–78, 72 L.Ed.2d 249 (1982) (citing this passage as the accepted standard for the adequacy of notice). *Cf. Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner).

The type of notice needed to inform and thus bind all future claimants who have not yet been injured concerning a manufacturer's bankruptcy reorganization is often quite difficult to conceive. Lack of any possible meaningful notice was a basis for one ruling in this District that refused to allow appointment of a legal representative for future asbestos claimants, even though asbestos was said to cause some injury to everyone in contact with it whether or not the injury is felt. *In re UNR Industries, Inc.*, 29 B.R. 741, 748 (N.D.Ill.1983), *appeal dismissed; Matter of UNR Industries, Inc.*, 725 F.2d 1111 (7th Cir.1984). The District Court decision was based on the conclusion that statutory and constitutional rights of future claimants cannot be subordinated to the bankruptcy "fresh start." *Id.* In dismissing for lack of an appealable order, the Seventh Circuit made clear that it was not passing on whether persons involved had a "claim" in bankruptcy. However, it opined in expansive dicta that,

> [t]he practical difficulties of identifying, giving constitutionally adequate notice to, and attempting to estimate the damages of the thousands upon thousands of people who have been exposed to asbestos sold by UNR but have not yet developed asbesto-

sis are formidable, and possibly insurmountable. Yet if any of them have already suffered a tort there would be no basis we can think of for not letting them file claims in this bankruptcy proceeding. And some, at least, probably have suffered a tort.

*Id.* at 1119.

However, the opinion went on to give further thoughts going in the other direction:

Even in states where exposed workers are not injured in a tort sense till the disease manifests itself, and therefore do not have an accrued tort claim in any sense, and even assuming that an unaccrued tort claim cannot be a "claim" within the meaning of 11 U.S.C. § 101(4)(A) (that is, a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, légal, equitable, secured, or unsecured"), a bankruptcy court's equitable powers (on which *see, e.g., Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); 1 Remington, A Treatise on the Bankruptcy Law of the United States § 22 (Henderson 5th ed. 1950)) just might be broad enough to enable the court to make provision for future asbestosis claims against the bankrupt when it approved the final plan of reorganization. The date on which a person exposed to asbestos happens to develop asbestosis is arbitrary. Could it not be argued therefore that a bankruptcy court can and should use its equitable powers, which traditionally "have been invoked to the end that ... substance will not give way to form, that technical considerations will not prevent substantial justice from being done," 308 U.S. at 305, 60 S.Ct. at 244 (especially, perhaps, in a reorganization case, *see In re Michigan Brewing Co.,* 24 F.Supp. 430 (W.D.Mich. 1938)), to prevent the liquidation or discharge of the bankruptcy before provision is made for such persons? And more than arbitrariness is involved. If future claims cannot be discharged before they ripen, UNR may not be able to emerge from bankruptcy with reasonable prospects for continued existence as a going concern. In that event, and assuming that UNR's going-concern value would exceed its liquidation value, both UNR (which is to say the creditors who will own UNR at the conclusion of the reorganization) and future plaintiffs would be made worse off, and UNR's current creditors would not necessarily be made better off, by the court's failure to act along the lines proposed by UNR.

But against all this it can be argued, returning to our first point, that it would be a quixotic undertaking far beyond the realistic boundaries of judicial competence to make sufficiently generous provision for upwards of a hundred thousand unidentified claimants to justify extinguishing their claims involuntarily; that even if only a small fraction of the claims were not extinguished the cloud of potential liability over UNR's head might still be too large for it to emerge from bankruptcy as a going concern with fair prospects of surviving in the long run; and that, as Judge Hart said, the solution to this problem must come from Congress.

*Id.* at pp. 1119–1120.

Giving notice to future tort claimants is of course hampered by the reality of having to discern who specifically will be injured in the future. Without knowing today who will perceive themselves hurt tomorrow and then press claims, notice to particular individuals cannot be given and the amount of future liability cannot be ascertained except through reference to projections. However accurate such projections, no meaningful notice can be given to individuals who do not yet know they suffer from injury.

The analysis is further complicated because there are different types of future claimants. Some may already be injured through some physical contact with a dangerous product with their bodies, but have not shown any symptoms and may not know of any illness in early stages. This category is synonymous with mass tort litigation arising out of injuries related to asbestos inhalation and is argued to be the case with defective breast implants and intrauterine devices. Another model comprises those who have not been injured through contact with debtor's

products, although they came in close proximity to such products but escaped any injury at all until after debtor's reorganization plan had been confirmed. Mr. Smith's case falls in the latter category.

To provide Constitutional notice required by the Due Process clause of the Fifth Amendment, some bankruptcy courts have established a trust vehicle, setting up separate distribution and claims procedure for future claimants, and appointed some present representative for future claimants to argue their interests during the confirmation process and afterwards. *In re Amatex Corp.*, 755 F.2d 1034 (3d Cir.1985); *Grady v. A.H. Robins Co., Inc.*, 839 F.2d 198 (4th Cir.1988); *In re Johns–Manville Corp.*, 36 B.R. 743, 745–746 (Bankr.S.D.N.Y.1984), *aff'd*, 52 B.R. 940 (S.D.N.Y.1985); *In re Eagle–Picher Industries, Inc.*, 189 B.R. 681 (Bankr.S.D.Ohio 1995). The constitutional adequacy of such trusts and claims is still in question, but need not be decided here because no such trust or appointment of claims representation was part of Debtor's confirmation process or Plan.

Mindful of conflicting bankruptcy policies and constitutional concerns, courts have developed different approaches to identifying which persons asserting tort claims caused by debtor's pre-petition conduct have prepetition "claims" and are thus bound by the confirmed Plan.

### The "Conduct" Test

Some cases have applied the "conduct test," under which a claim and right to plan payment arise when conduct giving rise to the alleged liability occurred. One oft-cited decision employing the conduct test was *Grady v. A.H. Robins Co. (In re A.H. Robins Co.)*, 839 F.2d 198 (4th Cir.1988). In *A.H. Robins*, the claimant Grady was inserted with a Dalkon Shield contraceptive, intrauterine device ("IUD") a few years prior to the bankruptcy petition date. However, she manifested injuries related to the Dalkon Shield only after the bankruptcy was filed. Under California state law, where suit was brought, her claims accrued when she discovered or should have discovered the injury. Grady therefore argued her claim arose post-

petition when she discovered injuries relating to the IUD. Disagreeing, the appeals court held that Grady's claim was a pre-petition contingent claim. The court reasoned that, since every act alleged to give rise to liability occurred pre-petition (including the product manufacture and any failure to warn), then her claim also arose pre-petition. *Id.* 839 F.2d at 201. That opinion focused on when the culpable conduct occurred in order to determine whether a "claim" for bankruptcy purposes was pre- or post-petition.

### The Pre–Petition Relationship Test

The "conduct" test has been viewed by other authorities as defining "claim" too broadly. Those required that potential future claimants have entered into some kind of relationship with debtor at the time they were injured or earlier. Thus, if their injury occurs post-petition, only if they purchased, used, operated, or came in contact with debtor's defective product in their ordinary activity pre-petition, were they found to have a pre-petition claim.

In *Pettibone v. Ramirez (In re Pettibone Corp.)*, 90 B.R. 918 (Bankr.N.D.Ill.1988) (Schmetterer, J.), the reorganized debtor was sued by Ramirez for injuries he had incurred while operating a forklift manufactured by debtor. The forklift was manufactured and sold to Ramirez's employer pre-petition, but was not operated by Ramirez until after the bankruptcy filing. *Id.* at 920. Ramirez was injured while working on the forklift post-petition but pre-confirmation. Pettibone sought to limit Ramirez to recovery only under the confirmed plan rather than have him recover 100% of any judgment from assets of the reorganized company. The ruling adopted a "relationship test" requiring some kind of pre-petition contract privity, use, or contact with the defective product. *Id.* at 932. Ramirez's tort claim was found to be post-petition because that is when his contact with the forklift began. *Id.* It was reasoned that finding Ramirez to have an "unmatured" claim against debtor pre-petition when he was not then even working on the forklift would inadmissibly stretch and pervert the definition of § 101(5). The ruling was particularly appropriate in a case

where debtor reorganized and had never brought Ramirez into the bankruptcy until he sued.

*Pettibone* left open the question of whether a party endangered by defective product pre-petition through contract privity, use, or otherwise but not at all injured until post-petition has an unaccrued or contingent claim under 11 U.S.C. § 101(5). The opinion also left open the question of whether a person injured post-petition by a pre-petition defective product could claim a right to distribution under a liquidating Chapter 11 plan or a Chapter 7 distribution if he pressed claim before the money was distributed.

Other courts also have adopted the pre-petition relationship test. *See In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir.1991); *In re Piper Aircraft Corporation*, 162 B.R. 619, 626 (S.D.Fla.1994) *aff'd* 58 F.3d 1573 (11th Cir.1995); *In re Correct Manufacturing Corp.*, 167 B.R. 458 (S.D.Ohio 1994).

Here, Kewanee manufactured the subject boiler in 1952. Smith started working with it in 1969, Debtor's Plan was confirmed in 1988, and the boiler accident injured Smith in 1989. He alleges negligent design or manufacture. The "conduct" test would therefore point to the date of manufacture as determining that Smith held an unmatured pre-petition claim under § 101(5). The pre-petition relationship test would find the time when Smith started working on the boiler in 1969 to be the relevant event giving rise to Smith's claim.

### Weaknesses of "Conduct" and "Relationship" Tests

The "conduct test" is not helpful in bankruptcies of manufacturing debtors in isolating and specifying those who may hold future claims against the estate.

That test does not help to identify and specify all persons who are potential claimants when proposing a plan of reorganization. The illustration used by the opinion in *In re Chateaugay Corp.*, 944 F.2d 997, 1003 (2d Cir.1991), makes this point. Should a bridge construction company file for bankruptcy, it will want to estimate its future liability on work it has performed. Using statistics it

may predict that some percentage of bridges it has constructed will fail. As a result, a certain likely number and nature of injuries can be projected. Such knowledge, however, is only helpful in predicting the approximate amount of total damages Debtor may become liable for. The company cannot possibly point to a set of identified persons who will be injured. Thus, it cannot give notice to future injury victims. When each potentially defective bridge was built, being the time during which the "conduct test" focuses, there is no way to predict who will be injured on the failure date. Indeed, those persons will remain unknown and unknowable until a bridge fails and persons are hurt or killed.

This illustration also highlights a weakness in the "relationship" test. Even if that test is used to determine when a claim arose, it remains impossible to predict the identity of persons who will be harmed by a debtor's defective products unless injury occurs prior to confirmation and special notice is given to such injured persons in time to permit them to participate in the bankruptcy process. Thus, while the "conduct" or "relationship" tests may suggest whether Smith had a theoretical contingent or unmatured pre-petition claim, he could not have been given meaningful notice before his injury. *In re Piper Aircraft*, 162 B.R. 619 (Bankr.S.D.Fla.1994), *aff'd Epstein v. Official Committee of Unsecured Creditors of Estate of Piper Aircraft Corp.*, 58 F.3d 1573 (11th Cir.1995), holding that future victims of aircrafts manufactured by Piper Aircraft could not hold a claim in Piper Air's bankruptcy, illustrates this problem.

Debtor in *Piper Aircraft* was trying to sell its assets in bankruptcy to another corporation. As part of the sale, debtor sought to appoint a legal representative for all persons who would in the future hold claims against it arising out of manufacture of defective airplanes and parts. The bankruptcy court approved an order appointing such a legal representative, who filed a $100 million proof of claim in bankruptcy. The Unsecured Creditors Committee objected to the claim. The projected future claimants were held not to hold "claims" in the bankruptcy as defined by § 101(5). The opinion noted that the $100

million claim was based on debtor's conduct, but had failed to identify any particular future claimants:

> There is no pre-petition exposure to a specific identifiable defective product or any other pre-petition relationship between the Debtor and the broadly defined class of Future Claimants. Since there is no way to connect the future claims to some pre-petition relationship, there is also no way to identify a discrete class of individuals who will have claims arising out of pre-petition conduct. In short, the Claim in this case fails even the broadest test for recognition of a "claim."

*In re Piper Aircraft,* 162 B.R. at 626.[3]

In *Fairchild Aircraft Incorporated v. Cambell (In re Fairchild Corporation),* 184 B.R. 910 (Bankr.W.D.Tex.1995), the opinion reasoned that all injuries either manifesting themselves or occurring because of debtor's pre-petition conduct may give rise to a pre-petition claim, only if it is possible to treat that potential claim in bankruptcy fairly without denying the injured person constitutional due process rights.

The facts there were analogous to those here. Fairchild manufactured aircraft. In 1990, it filed for Chapter 11 bankruptcy relief. Later that year, its assets were sold as part of the confirmed Plan of Reorganization. Sale documents provided that the purchaser did not assume liability for any of debtor's pre-petition acts, including manufacture of defective products. However, the confirmed plan through which the sale was carried out did not provide any recovery for victims of future accidents involving airplanes manufactured by Fairchild. No effort was made to reach or notice the owners and operators of planes sold by Fairchild Aircraft in the past, just as no effort was made in the Kewanee

confirmation process to notify purchasers and users of Kewanee boilers.

The *Fairchild* plan and sale were confirmed in 1990. Three years later, a plane manufactured by Fairchild crashed. Several of the victims sued "Fairchild Acquisition" (the purchaser and successor corporation), on various tort liability theories. Fairchild Acquisition filed an adversary proceeding in the bankruptcy court where the sale and the plan had been confirmed three years earlier to enjoin the state court lawsuit, claiming that any injuries occurring after the confirmation date were discharged by the terms of the sale agreement and confirmed plan.

The *Fairchild* court had to decide whether the confirmed plan could lawfully provide for such forward-looking absolution for the successor corporation, and whether in fact it did. The ruling was that confirmed plans may, in certain situations, be so structured that injuries occurring post-confirmation and arising out of debtor's pre-petition conduct may be treated and limited as pre-petition claims. However, the confirmed plan in that case was not structured in such manner, and therefore the claim was held not to be satisfied out of the bankruptcy estate or forced to participate in that estate.

*Fairchild* reasoned that any potential liability of a debtor that could be dealt with through effective notice should be dealt with in bankruptcy:

> When one sits down to consider restructuring one's affairs, a responsible actor will seek to deal not only with today's bills but also with the liabilities that are likely to come up for one reason or another in the future, at least insofar as they are within the fair contemplation of the debtor.... There's not much of a fresh start to a

---

**3.** In *Epstein v. Official Committee of Unsecured Creditors,* 58 F.3d 1573 (11th Cir.1995), the Eleventh Circuit agreed with the district court's holding in *Piper Aircraft* that a pre-petition relationship test is more consistent with the purposes of the Bankruptcy Code. The appeals court, however, found that there is no reason to restrict the class of future claimants to those claimants having contact with debtor's product pre-petition. Those claimants having contact with debtor post-petition but prior to confirmation also could be identified during the bankruptcy case as poten-

tial victims and therefore hold pre-petition claims.

The court of appeals added the requirement that the basis for liability is debtor's pre-petition conduct. Thus, the "Piper Test," as the court of appeals called it, requires a pre-petition relationship between the injured person and debtor plus certain culpable conduct by the debtor pre-petition. The same expanded test was adopted in the context of environmental liability by *In re Russell,* 193 B.R. 568, 570 (S.D.Cal.1996).

restructuring that makes no provision for significant liabilities that, though perhaps less quantifiable, are no less real in terms of their eventual impact on the debtor's future.

*Id.* at 925–26.

However, *Fairchild* also recognized that the expansive definition of "claim" under § 101(5) must be limited to claims that can be properly administered through the bankruptcy process. The proper definition of "claim" was found to be inextricably tied to due process and notions of fundamental fairness. In this, the opinion relied partly on the Fifth Circuit opinion in *Lemelle v. Universal Mfg. Co.*, 18 F.3d 1268 (5th Cir.1994). *Lemelle* had suggested that, even if a claim were found to be pre-petition, it might nevertheless survive discharge under § 1141(c) if discharge would violate due process rights. Furthermore, the court noted, aside from constitutional constraints, that the bankruptcy process itself must be fair in the broader, more equitable sense. *Id.* at 927. Thus, under *Fairchild Aircraft*'s reasoning, future claims arising out of debtor's pre-petition conduct may be a "claim" in bankruptcy even if the injury occurred post-confirmation, but such future injuries will become claims bound by a confirmed plan only if they are capable of being handled in bankruptcy in a manner compatible with constitutional due process and fair notice under the Bankruptcy Code and rules. Notions of fundamental fairness do not allow adjudication of a person's property rights without their having any way of participating in or being involved in the process. *Id.* at 927.

▮ Procedural due process and requirements of meaningful notice are indeed a limitation on what possible "claims" may be controlled by a confirmed plan in bankruptcy.

### Due Process Analysis in Class Actions

*Fairchild Aircraft* noted that precedent regarding class actions possible under Fed. R.Civ.P. 23 may be a guide to the outer limits of fairness and procedural due process. *Id.* at 929. It looked to the class action case *In re "Agent Orange" Product Liability Litigation*, 996 F.2d 1425 (2d Cir.1993), observing that "class actions provide us with the most telling parallel" as to whether "[n]otions of fundamental fairness will ... tolerate a potential claimant's rights being affected without its having had any way of participating in or being involved in the process." 184 B.R. at 927.[4]

In *"Agent Orange"*, the district court crafted a combination of devices, such as publication notice and the appointment of a class representative. However, some claimants argued that they ought not to be bound by orders entered in the class action. Among other things, they challenged notice and maintained they were not afforded adequate opportunity to exclude themselves from the class, but the district court was affirmed.[5]

The question of whether all future claims may be handled constitutionally in one judicial proceeding has not yet been definitively answered, even in class actions. Administra-

---

4. *Newberg on Class Actions* devotes a full section to "Class Action Advantages over Bankruptcy Procedures." 4 *Newberg on Class Actions*, § 20.31. The treatise finds class actions bring fairer results, are a better settlement vehicle, less vulnerable on appeal, more efficient, and provide a device to avoid certain bankruptcy obstacles, such as inflexible bar dates, while avoiding potential abuses in mass tort resolution. *Id.*

5. *In re "Agent Orange" Product Liability Litigation*, 996 F.2d 1425 (2d Cir.1993), affirmed a class. That class was defined as persons who would allege personal injury from exposure to dioxin during the Vietnam War and any of their spouses, parents, and children born before January 1, 1984, claiming some derivative injury. *In*

re *"Agent Orange" Liability Litigation*, 100 F.R.D. 718, 729 (E.D.N.Y.1983), aff'd *In re "Agent Orange" Product Liability Litigation*, 996 F.2d 1425 (2d Cir.1993). This class apparently included some exposed veterans who could not yet show any physical illness assertedly associated with exposure to dioxin, the carcinogen compound which was said to make Agent Orange harmful. The notice given in that case consisted of publication about pendency of the class action lawsuit in a magazine thought to be read by veterans. That notice defined the relevant exposure period and specified how to opt out of the class. The parties challenging class certification alleged that they could not have known of the opt-out bar date because their injuries had not yet manifested themselves by the bar date. The opinion found the notice given to be adequate,

tion of all claims arising from use of one product is a legally complex enterprise which often cannot be undertaken in one nationwide class action. The recent decisions in *Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir.1996), and *Castano v. American Tobacco Company*, 84 F.3d 734 (5th Cir. 1996), exemplify limitations on use of class actions to decide the whole spectrum of liability, past, present, and future, arising out of sale and use of one product throughout the United States. Overly broad class certifications were reversed in both *Georgine* (seeking class certification so as to settle all pending and future lawsuits against a group of asbestos manufacturers), and in *Castano* (where class certification was sought for all persons who smoked cigarettes and became addicted to nicotine after 1947).[6]

As both cases illustrate, existence of many and different legal and factual issues, issues of justiciability, the differences in state law where the torts occurred, and their sheer logistical complexity makes the adjudication of mass tort cases in one class action problematic.

Another reason why *Georgine* reversed class certification was because the future claimants there could not have been adequately represented by lawyers that also represented persons who had already developed an illness as result of their exposure. *Id.* at 630. The interests of the named plaintiffs were not sufficiently aligned with the interests of those who realize injury in the future. *Id.* The interests of those presently injured and those who would be future plaintiffs differed widely in several respects. The two groups had differing interests in assuring whether protection against inflation was provided (good for future claimants, bad for present claimants who want the settlement pot to be available to them) and whether opt-out provisions were lenient (future claimants would want opt-out provisions to be available and delayed to allow for symptoms to occur, thus posing larger claims in competition with present claimants). Present and future claimants also had different interests regard-

finding "due process" and "notice" to be a flexible concept.

**6.** In *Georgine*, the certification of a class of persons who were exposed to asbestos was sought for purposes of a settlement approval. The class action sought to settle the claims of up to two million individuals who had been exposed to asbestos manufactured by a group of twenty companies. The settlement agreement sought to resolve the claims of all present and future claimants. Particularly, those plaintiffs who had not developed an illness from inhaling asbestos fibers (exposure-only claimants) received no payment under the settlement agreement. Class certification was granted by the district court for purposes of the settlement agreement, *Georgine v. Amchem Prods. Inc.*, 157 F.R.D. 246 (E.D.Pa. 1994), and an injunction was issued barring class members from initiating claims against any of the twenty manufacturers pending a final in the case. *Georgine v. Amchem Prods. Inc.*, 878 F.Supp. 716, 723 (E.D.Pa.1994).

Persons exposed to asbestos but not yet sick appealed, challenging justiciability of the action in the district court where the class certification was first brought and arguing that the suit to certify the class action presented no justiciable controversy since it was filed without any intention to ever litigate the matter. Standing, subject matter jurisdiction, and personal jurisdiction were also challenged. It was argued that notice and other requirements under Fed.R.Civ.P. Rule 23 were not fulfilled. The court questioned whether all issues in this case were justiciable and whether it had subject matter jurisdiction. While the court had "serious concern as to the constitutional adequacy of class notice, [it] decline[d] to reach these issues, and pass on the class certification issues." *Id.* at 623. The opinion found not only that the lawsuit involved different issues of law because of the different products, ways of exposure, amounts of time and periods of exposure, but that these different legal issues were made "exponentially" more complex because an individualized choice of law must be applied to each analysis. *Id.* at 627. Commonality and predominance requirements for the class action certification test were found not to be met.

Similarly, in *Castano v. American Tobacco Company*, 84 F.3d 734 (5th Cir.1996), the court reversed the certification of a class of persons who had become addicted to nicotine through the alleged misrepresentations and fraudulent manipulation of nicotine levels in cigarettes by tobacco manufacturers. *Id.* at 751. The *Castano* decision reversed the district court, granting a class action because the lower court had not considered how each claim in the complaint varied under the law of different states and because it did not make a finding of whether litigation is manageable in light of these differences. *Id.* at 739. The court found that there were "extensive manageability problems" which included "difficult choice of law determinations, subclassing of eight claims with variations in state law, Erie guesses, notice to millions of class members, further subclassing taking account of transient plaintiffs, and the difficult procedure for determining who is nicotine dependent." *Id.* at 744.

ing the amount of the current payout, such as whether there should be a cap on the number of future actions to be filed, and whether defendants should be able to withdraw from the settlement in the future. The settlement reached was in fact skewed in favor of the present injury victims who were actual clients of counsel selected for the class. It allowed very few persons to opt-out (approximately 2%), provided no hedge against inflation, and allowed any defendants to withdraw only within a ten year period. Similar concerns could also apply in any bankruptcy wherein counsel to presently injured persons seek also to represent interests of the future injured.

In an effort to avoid such conflicts of interest on behalf of counsel representing tort victims in bankruptcy, courts have used a special class representative to represent only the interest of future claimants, a sort of guardian *ad litem. See also In re Johns–Manville Corp.*, 68 B.R. 618 (Bankr.S.D.N.Y. 1986), *aff'd in part rev'd in part*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom., Kane v. Johns–Manville Corp.* 843 F.2d 636 (2d Cir. 1988); *In re A.H. Robins Co.*, 88 B.R. 742, 744 (E.D.Va.1988), *aff'd sub nom., Menard–Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989) (granting class certification to victims of asbestos related diseases and appointing a representative for persons exhibiting injuries in the future); *but see In re UNR Industries, Inc.*, 29 B.R. 741 (N.D.Ill.1983) (refusing to appoint a legal representative for persons exposed to asbestos fibers but who had not contracted any disease). Such appointment goes a long way to avoid counsel's conflict of interest, but, without more, does not deal with the notice problem.

While declining to visit the issue of whether notice to future claimants was constitutionally feasible, the *Georgine* opinion did note as part of its analysis that notice problems for the defined class would make a class action unfair.[7] The concerns regarding notice in *Georgine* are similar to those described in *UNR Industries, Inc.*, 29 B.R. 741 (N.D.Ill.1983), *appeal dismissed, Matter of UNR Industries, Inc.*, 725 F.2d 1111 (7th Cir.1984).

While not ruling on whether any notice would or could be constitutional, *Georgine* thereby demonstrated why notice to future claimants is problematic under the Fifth Amendment in any case seeking to deal with future claims.

### Notice Requirements to Future Claimants in Bankruptcy Reorganization

Problems of notice and representation for future claimants must be confronted in bankruptcy proceedings as well as in class actions.

The Bankruptcy Code encourages businesses to reorganize through rewriting debt. However, the Code cannot justify disregard-

---

7. [I]n this class action, plaintiffs may become bound to the settlement even if they are unaware of the class action or lack sufficient information to evaluate it. Problems in adequately notifying and informing exposure-only plaintiffs of what is at stake in this class action may be insurmountable. First, exposure-only plaintiffs may not know that they have been exposed to asbestos within the terms of this class action. Many, especially the spouses of the occupationally exposed, may have no knowledge of the exposure. For example, class representatives LaVerne Winbun and Nafsica Kekrides did not learn that their husbands had been occupationally exposed to asbestos until the men contracted mesothelioma. Second, class members who know of their exposure but manifest no disease may pay little attention to class action announcements. Without physical injuries, people are unlikely to be on notice that they can give up causes of action that have not yet accrued. Third, even if class members find out about the class definition, they may lack adequate information to properly evaluate whether to opt out of the settlement. . . .

[Mesothelioma] has been known to occur in persons who lived with an asbestos-exposed parent, or in household members who washed the clothes of people who worked with asbestos. Unlike other asbestos related cancers, mesothelioma has only one medically established cause: asbestos exposure. The unpredictability of mesothelioma is further exacerbated by the long latency period between exposure to asbestos and the onset of the disease, typically between fifteen to forty years. As a result, persons contracting the disease today may have little or no knowledge or memory of being exposed. It is unrealistic to expect every individual with incidental exposure to asbestos to realize that he or she could someday contract a deadly disease and make a reasoned decision about whether to stay in this class action.

*Georgine*, 83 F.3d at 633.

ing due process concerns and bankruptcy notice requirements to the detriment of persons affected and benefit of businesses seeking to eliminate liability and their known creditors who receive notice. *See In re UNR Industries, Inc.,* 29 B.R. 741, 747 (N.D.Ill. 1983) (the possibility of giving debtor a "fresh start" ... "is not as important as ... the statutory and constitutional rights of those who do not yet know that they will in the future suffer from a dread disease").

The extent to which notice can be given may well determine the extent to which future debt can be managed. Different products and circumstances may require different outcomes. One rule does not fit all cases where future claims may arise.

For example, in the case of defective automobiles, the purchasers can easily be found and noticed to file claims. However, no notice can reach future victims of an airplane crash that will injure passengers or of a boiler explosion that will injure people fortuitously in the vicinity. Even though the manufacturer may be able to estimate its liability, problems of notice in such cases seem insurmountable. Notice to the purchasers will not reach future victims. Notice by publication would be meaningless in these cases where there is no relationship between the product and a set of specific persons. Notice of any form is not sufficient there, even in the unlikely event the manufacturer would acknowledge and publish notice of great danger for any persons near its product as by posting a sign to that effect on every airplane or boiler.

In some cases, of course, identification of unknown injured persons who do not know of their injury may be possible and thus meaningful notice may also be possible. In *Chemetron Corporation v. Jones,* 72 F.3d 341 (3d Cir.1995), notice by publication was found to be constitutionally sufficient to all persons affected by radiation deposited in a landfill by debtor's predecessor. In *Chemetron,* it was possible to ascertain and notify persons affected by debtor's acts who did not yet hold a claim at state law but who might potentially exhibit injuries in the future.

Chemetron Corporation operated a manufacturing facility in Ohio which manufactured a chemical compound using uranium. It ceased operation in 1972 and demolished the facility, depositing the rubble in a landfill close to a residential neighborhood. The landfill was radioactive, and those living in the neighborhood or visiting there were exposed to this radioactivity. Chemetron filed for Chapter 11 protection in 1988 after its efforts to clean up the landfill were unsuccessful. The bankruptcy court ordered actual notice to persons known to have claims, and notice in the *New York Times* and the *Wall Street Journal* to all other claimants. In 1990, a reorganization plan was approved. Two years later, 15 individuals sued the successor corporation in state court, alleging injury from exposure to toxic chemicals as a result of time spent at or near the site. Of all the claimants in this suit, only two had actually occupied homes in the area during the time when Chemetron owned the sites. The other members of the group only visited the property periodically.

Chemetron sought to dismiss the lawsuit, arguing that claims raised in the lawsuit had been discharged in bankruptcy. The bankruptcy court found that the claimants were "known creditors" entitled to actual notice and permitted the claimants to proceed with their state court action. The Third Circuit opinion defined the issue as being whether the 15 victims of radiation were "known" or "unknown" victims at the time of the bankruptcy. It reasoned that "known" claimants of the estate are either known or ones whose identity is "reasonably ascertainable by the debtor." *Id.* at 346, *citing Tulsa Professional Collection Serv., Inc. v. Pope,* 485 U.S. 478, 490, 108 S.Ct. 1340, 1347, 99 L.Ed.2d 565 (1988). "Known" claimants deserve actual notice. An "unknown" claimant is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." *Chemetron,* 72 F.3d 341, 346, *citing Mullane,* 339 U.S. at 317, 70 S.Ct. at 658–59. The Circuit opinion in *Chemetron* cited various cases for the proposition that notice by publication has been found sufficient for "unknown" claimants. *Chemetron* 72 F.3d at 346.

The Third Circuit opinion also found that claimants in issue were "unknown" at the

time of bankruptcy since they were not "reasonably ascertainable" as required by the Supreme Court language in *Tulsa Professional Collection Services.* The court rejected as unworkable the bankruptcy court's adoption of a broader "reasonably foreseeable" standard for "known" claimants. *Id.* at 347–48. The "reasonably foreseeable" test was found to be unworkable in the case of radiation because "causational difficulties are manifold and apparent." As a result, the opinion reasoned that any title searches or searches for those persons who regularly visited neighborhood residents would be cumbersome and without a clear limit.

*Chemetron* decided that notice in the *New York Times* and the *Wall Street Journal* was sufficient being "reasonably calculated, under the circumstances, to apprise interested parties who were mostly in Ohio of the pendency of the action and afford them an opportunity to present their objections." *Chemetron,* 72 F.3d at 348, *citing Mullane,* 339 U.S. at 314, 70 S.Ct. at 657.[8] While this is indeed the proper standard for ascertaining whether notice by publication in a certain form is sufficient, its application in *Chemetron* was at best questionable. A broader local publication and more far-reaching effort would have been more efficient in actually reaching affected parties in Ohio than publication in the *New York Times* and the *Wall Street Journal.*

Most persons in the 15–person group at issue there were foreseeable victims who could have been ascertained by a diligent title search and interviews with some residents, and, as to persons not specifically identified, noticed through local publications, local distribution of pamphlets, and notices in

publications that service injury attorneys. Indeed, such broader effort might well have been "... notice as is appropriate in the particular circumstances." 11 U.S.C. § 102(1).

The present case is unlike *Chemetron,* where present and future victims could have been identified and notified. Identifying persons who might come in close proximity to any of Kewanee's boilers that were manufactured imperfectly would have been impossible at time of confirmation here. While a list could have been compiled of those who had purchased all the boilers, it is doubtful that notice to such parties and their employees could have reached all future victims of malfunctioning boilers or that anyone would have known what to do with notice of a bankruptcy as to which they then had no claim of injury. It is also doubtful that notice to the buyers of the boilers and their employees would motivate them to participate meaningfully in the proceeding. But apart from all this, it is clear that Debtor made no attempt to reach such endangered persons with any notice. It cannot obtain the benefit of notice that was not even attempted.[9]

### Application to Facts Here

There is no dispute for purposes of the pending motions that injuries alleged by Smith assertedly arose out of pre-petition conduct of the Debtor. The basis for liability, if any, is Kewanee's manufacture and sale of an allegedly defective boiler. There is also no dispute that the explosion occurred more than one year after Kewanee was reorganized and that the injury alleged by Smith occurred at the time of the explosion.

---

**8.** Although *Mullane* involved notice to beneficiaries on a judicial settlement, subsequent courts have interpreted *Mullane* to set the standard for notice required under the due process clause in Chapter 11 bar date cases. *See, e.g., In re Pettibone Corporation,* 162 B.R. 791, 806 (Bankr. N.D.Ill.1994); *In re R.H. Macy & Company,* 161 B.R. 355, 359 (Bankr.S.D.N.Y.1993).

**9.** It is hard to contemplate any meaningful notice by Kewanee Boiler. Should Debtor have sent out large stickers to be affixed to every boiler it had ever sold warning persons coming in contact with the boiler that they may be dangerous and any claims they may have for future injuries were

being resolved in bankruptcy where they were invited to file a claim? To frame such a theoretical notice is to recognize why it was not sent. Few manufacturers in bankruptcy would risk the hullabaloo and enormous volume of different claims that would follow such an act. Moreover, Kewanee management probably considered its boilers to have been properly manufactured and would not have dreamed of exposing itself to the results of a public confession. However, the Debtor in this case wishes the benefit of such notice although it was not given to Smith or anyone else.

However, the Kewanee confirmed Plan did not take steps to limit its liability to future tort victims through the bankruptcy either by any attempt to notice them or through any special provision for them in the Plan. No fund was provided for distribution to these future claimants. No claims were ever filed on behalf of possible future claimants and never was a legal representative appointed. The Plan itself never expressly provided for payment to a future class of claimants who had at that time not been injured by Kewanee's products manufactured before bankruptcy was filed, but would or might be injured thereafter.

Because no such provision was made in the Plan, and because future victims of torts were not represented in the bankruptcy or noticed, these persons cannot be forced into participating in the limited distribution that unsecured creditors are entitled to receive under the Plan here. Whether Smith had a "claim" under § 101(5) is doubtful because he had no right to payment prior to confirmation. But even if he did, his right to notice under bankruptcy law and the Constitution were not met.

Moreover, it is clear from the disclosure statement in this case that known pre-petition unsecured creditors were not told that their recovery from a fixed pot could be diluted by possible future post-confirmation claimants being injured. Indeed, the Debtor's position, if adopted, would make the whole Plan illusory. The OakFabCo position has no limit in time. If Smith is barred by the confirmed Plan, then why not someone injured by a boiler explosion next year? Or five years from now? How can the sinking fund ever be distributed if injured parties from post-confirmation explosions must be covered? If Debtor's approach here were correct, the unsecured creditors voted on an illusory plan from which they can never finally recover what they were promised. In the absence of anything in the Plan to warrant such a result, the absence of special treatment to future claimants must be read to mean that they were not treated at all in the confirmed Plan.

The fact pattern of *Fairchild Aircraft* is very similar in this regard. The reorganized debtor sought to enjoin a post-petition victim of an allegedly defective airplane from suing. The plan there did not provide for any distribution to future crash claimants, nor any attempted notice to such persons, nor legal representative. Because future claimants were not dealt with in the bankruptcy case, their claims could not be treated as bankruptcy claims. *In re Fairchild Aircraft*, 184 B.R. at 910.

There was a similar result in *In re Savage Industries*, where the debtor, Savage Industries, Inc., manufactured guns and ammunition. *In re Savage Industries*, 43 F.3d 714, 716 (1st Cir.1994). Through the bankruptcy process, it sold its assets to Savage Arms, which had been incorporated for the purpose of acquiring debtor's assets. After the bankruptcy petition was filed, but prior to plan confirmation, a person was injured with a firearm manufactured by Debtor preconfirmation. He sued in state court, asserting successor liability for product defects, and the reorganized company sought to enjoin the lawsuit in the bankruptcy court. *Id.* As here, the confirmed plan made no provision for contingent product liability claims, although the asset transfer agreement did disclaim liability arising out of debtor's pre-transfer acts. The bankruptcy court held that the state court action would be barred insofar as it constituted a tort claim against Savage Industries which arose when the gun was manufactured and before either the Chapter 11 asset transfer or confirmation of the Chapter 11 plan. The First Circuit reversed, finding that "[n]otice is the cornerstone underpinning Bankruptcy Code procedure." *Id.* at 719. Because Taylor was never afforded appropriate notice of the bankruptcy proceeding or of the privately negotiated sale, his claim was not extinguished or limited in bankruptcy. *Id.* at 720.

Even where confirmed Chapter 11 plans have dealt with future liability, no case has been found that forced persons injured entirely post-petition to be bound by the bankruptcy because they were merely in the vicinity of the product manufactured pre-petition. *A.H. Robins* and *Johns–Manville* are cases where such proximity to a

defective and harmful product forced a post-petition claimant to share in past bankruptcy settlement. There some physical contact between the victim and the product actually occurred with some injury pre-petition. In those cases, however, exhaustive procedures were undertaken in an effort to assure constitutionality of trusts created for future claimants.

In all cases found where a trust was created out of which future claims against the estate were to be paid, some assertedly injurious contact between the future victim and the product occurred pre-petition. Only the manifestation of a disease was lacking. In those cases, the existence of pre-petition physical contact, such as inhalation of asbestos, *Johns–Manville, Amchem,* or insertion of a contraceptive, *A.H. Robins,* or implantation of a breast implant, *Dow–Corning,* more or less fixed the class of potential victims. In cases like *Fairchild Aircraft* and the case at bar, where absolutely no physical harm was suffered pre-bankruptcy and only some proximity to the product could be shown, a different practical and constitutional issue is presented.

Should Kewanee's Plan be read to apply to post-confirmation injuries, enjoining of Smith's efforts to liquidate his claim against the reorganized debtor and forcing him to partake in Kewanee's bankruptcy would be an inadmissible deprivation of his property interest in that claim, wholly without prior due process notice or bankruptcy notice. Even if due process concerns and absence of bankruptcy notice did not foreclose Debtor's position, there was never any attempt in the confirmed Plan to adjudicate what future injured victims were to collect for their injuries. Anyone seeking a finding that a future injured party holds a claim in a Chapter 11 bankruptcy must at least show that such future claimant's rights were actually and specifically adjudicated in that bankruptcy.

### *OakFabCo's Motion to Vacate the May 6 Order*

OakFabCo seeks to have the May 6 order allowing Smith to withdraw the claim he filed on May 15 vacated. That motion is denied, since Smith's claim is not found to be a pre-petition claim or any claim at all against the assets of this bankruptcy estate under the confirmed Plan. Indeed, he lacks any right to claim from or against the sinking fund. Thus, the claim was properly withdrawn.

### *CONCLUSION*

Ideally, bankruptcy is the forum for debtors to deal with all consequences of their pre-petition behavior. Doing so implements policy underlying the Bankruptcy Code. However, absolving debtors of all repercussions flowing from their pre-petition behavior can only be achieved within the constraints of the Constitution and notice requirements under the Bankruptcy Code.

For two reasons, Kewanee bankruptcy did not discharge or limit Smith's tort claim. First, Debtor could not constitutionally discharge the claims of persons like Smith whose causes of action might accrue under state law post-confirmation. At the time of confirmation, persons who could be and still might be injured could not be identified with enough specificity to allow them to be notified. No provision could be made in the bankruptcy proceeding to constrain these future claimants to any distribution under a reorganization plan. Discharge of their future claims would violate the Fifth Amendment because of fairness and due process concerns and would also violate bankruptcy notice requirements.

Second, when dealing with claims not yet accrued at state law, where future claimants can be identified, special provisions must be made to bring them within the confines and limits of bankruptcy of their claims. Notice to the extent possible, adequate representation, and a fair and specific distribution are several such requirements. At least the Plan must directly and openly deal with the problem, not submerge it in generalized language for treatment of unsecured creditors.

In this case, the Debtor did not attempt to provide future tort claimants such as Smith with special representatives, any form of notice, or any special trust fund or distribution. OakFabCo now seeks to deprive Smith of his right to liquidate his claim and to collect for

his injuries. It seeks to have Smith bound by a pre-petition "claim" under § 101(5), although he had no "right to payment" under any law at that time, and therefore no "claim" under § 101(5).

The fact that Smith filed a claim in Kewanee's bankruptcy when such late filings were allowed is irrelevant. He had no pre-petition claim, and his post-confirmation claim cannot be affected by OakFabCo's plan of reorganization.

As a result, Smith's motion for summary judgment on both Count I and II of the Complaint will be granted and OakFabCo's motion to vacate the May 6, 1994 order will be denied. Separate orders on these rulings will be entered.